**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Miami Division**

**CASE NO.:** 1:16-CV-22786

| | |
|---|---|
| COPHAZ INVESTMENT, INC., and IMPEX OF DORAL, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| JARDIM USA, LLC, Enrique Larach, Luis Miguel Pando, Jorge Larach, Triangle Partners, Inc., and Luis Torrego, | ) ) ) ) ) |
| Defendants | ) ) |

**COMPLAINT**

Plaintiffs, Cophaz Investment, Inc. and Impex of Doral, Inc. ("Plaintiffs") hereby sue

JARDIM USA, LLC; Enrique Larach; Luis Miguel Pando; Jorge Larach; Triangle Partners, Inc.;

and Luis Torrego (collectively "Defendants"), and in support of Plaintiffs' claims for relief,

allege as follows:

**JURISDICTION AND VENUE**

1. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332.

2. The amount in controversy for this action is in excess of $75,000.00.

3. Additionally, jurisdiction and venue are proper in Miami-Dade County, Florida because

    Section 8.11 of the Stock Purchase Agreement provides:

> Governing Law. This Agreement shall be governed by, and construed in accordance with, the Laws of the State of Florida. All Actions arising out of or relating to this Agreement shall be heard and determined exclusively in any **federal court** sitting in Miami-Dade County, Florida; provided, however, that if such federal court does not have jurisdiction over such Action, such Action shall be heard and determined exclusively in any Florida state court sitting in Miami-Dade County, Florida. Consistent

with the preceding sentence, the Parties hereby (a) submit to the exclusive jurisdiction of any federal or state court sitting in Miami-Dade County, Florida for the purpose of any Action arising out of or relating to this Agreement brought by either Party and (b) irrevocably waive, and agree not to assert by way of motion, defense, or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the transactions contemplated by this Agreement may not be enforced in or by any of the above-named courts.  The parties hereby agree that the mailing of process or other papers in connection with any such Action or proceeding in the manner provided in <u>Section 8.02</u>, or in such other manner as may be permitted by Law, shall be valid and sufficient service thereof and hereby waive any objections to service accomplished in the manner herein provided.

(emphasis added).

5. This Court has supplemental jurisdiction over all State law claims pursuant to 28 U.S.C. § 1367(a) because the claims form part of the same case or controversy under Article III of the United States Constitution.

6. Venue in this district is proper under 28 U.S.C § 1391 because the transactions that are the subject matter of this action, as well as the breaches addressed below, which are the bases for this action, occurred and/or will accrue in Miami-Dade County, Florida.

## PARTIES

7. Plaintiff Cophazis a Company formed under the laws of Panama, and Plaintiff Impex is a Florida Corporation.

8. Triangle Partners, Inc. and Luis Torrego are named herein as Intermediaries in a stock sale transaction as defined in the Florida Securities Investor Protection Act ("FSIPA"), specifically, 517.021, Florida Statutes, and as intended beneficiaries of the Stock Purchase Agreement. (*See* Section 517.021, F.S.: "'Intermediary' means a natural person residing in the state or a corporation… which facilitates the offer or sale of securities under 517.0611.")

Our File Number: R626

9.  Defendant JUSA is an administratively dissolved Florida Limited Liability Company that has conductedbusiness in the State of Florida.

10. Defendant Luis Miguel Pando is an individual who, based on knowledge and belief, is over the age of 18, is residing in the Dominican Republic, and is otherwise *sui juris*.

11. Defendant Enrique Larachis an individual who, based on knowledge and belief, is over the age of 18, is residing in Miami-Dade County, Florida, and is otherwise *sui juris*.

12. Defendant Jorge Larachis an individual who, based on knowledge and belief, is over the age of 18, is residing inHonduras, and is otherwise *sui juris*.

13. Defendant Luis Torregois an individual who, based on knowledge and belief, is over the age of 18, is residing in Miami-Dade County, Florida, and is otherwise *sui juris*.

14. Defendant Triangle Partners, Inc. is a Florida Corporation doing business in the State of Florida.

## <u>GENERAL ALLEGATIONS</u>

15. This is an action for declaratory relief, filed pursuant to Chapter 86, Florida Statutes, and for other relief.

16. This is an action arising out of a Stock Purchase Agreement between Plaintiff Cophaz Investment, Inc. ("Cophaz") as Purchaser, and JARDIM USA, LLC ("JUSA"), Luis Miguel Pando, and Enrique Larach as "Sellers," for the shares and assets of Impex of Doral, Inc. ("Impex" or the "Purchased Entity").

17. Based upon the facts set forth below, a bona fide, actual, present and practical need for a declaration exists.

18. The declaration concerns a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.

Our File Number: R626

19. The Plaintiffs' rights herein are dependent upon the facts or the law applicable to the facts.

20. The parties to this action have, or may reasonably have, actual, present, adverse and antagonistic interests in the subject matter, in fact and law.

21. The relief sought herein is not merely the giving of legal advice or the answer to questions propounded for curiosity.

22. Plaintiffs have retained the services of Recalde Law Firm, P.A. (RFL) to represent their interests in this action and are obligated to pay RLF a reasonable fee for its services.

23. All conditions precedent to the filing of this action have been performed, have occurred or have been waived.

## <u>BACKGROUND</u>

24. Plaintiff Cophazis an investment vehicle managed by owners of a major diaper manufacturer and distributer with operations based in Quito, Ecuador. Impex(a Florida Corporation domiciled in Miami, Florida) is a diaper manufacturer that was, until November of 2013, owned by Sellers JUSA and Enrique Larach.

25. This dispute arises out of Plaintiff Cophaz's acquisition of the shares and assets of Impex of Doral, Inc. in November of 2013. The Plaintiffs and the Sellers are parties to a Share Purchase Agreement, entered into and effective November 18, 2013 (the "SPA"). Pursuant to the SPA, Cophaz purchased the Sellers' company, Impex of Doral, Inc.,for approximately $3,917,735.00 (representing the "Initial Closing Date Payment" plus the "Transitional Compliance Payment").In addition, there is an upcoming Earn-Out payment, which is subject to set-offs as explained more fully below. A copy of the SPA is attached hereto as <u>Exhibit A</u>.

26. Defendant/Seller Luis Miguel Pando personally undertook certain obligations under the SPA, including indemnity obligations pursuant to Article VII thereof. Defendant/Seller Enrique Larach is Luis Miguel Pando's former business partner and, based upon knowledge and belief, the nephew of Defendant Jorge Larach, a creditor of the Purchased Entity whose claim was not disclosed by the Sellers.

27. In both pre-acquisition negotiations and in Article III of the written SPA, the Sellers represented material facts to Plaintiff Cophaz regarding the Purchased Entity, including representations regarding outstanding liabilities and indebtedness to third parties. For example, in Section 3.08(ii) of the SPA, Sellers represented and warranted that "the Financial Statements, taken as a whole, fairly present the financial condition of the Company in all material respects," and in Section 3.09 of the SPA, Sellers represented and warranted that "[t]he Company has no liability of any nature, except (i) as disclosed, reflected or reserved against in the Financial Statements, (ii) for the Related Party Indebtedness, (iii) for Liabilities incurred in the Ordinary Course of Business." Such representations were intended to and did induce Cophaz to purchase Impex of Doral, Inc. However, subsequent to the acquisition, Cophaz discovered that the material facts represented, concerning outstanding liabilities and indebtedness to third parties, were not represented accurately. Accordingly, based on these misrepresentations of material fact which were detrimental toCophaz, Cophaz seeks relief in the form of equitable rescission of the Agreement and damages, and brings claims against the Defendants for rescission, breach of contract, fraudulent (intentional) misrepresentation, negligent misrepresentation, violation of the Florida Securities and Investor Protection Act, for indemnification, and for declaratory judgment.

28. In particular, on or about May 13, 2016, Impex of Doral, Inc. received a demand letter (the "Demand Letter") from Jorge Larach's attorney, Matias R. Dorta, Esq., seeking to collect on an alleged promissory note (the "Claim").  A true and correct copy of the Demand Letter and its attachments are attached hereto as Exhibit B.[1]

29. However, prior to the acquisition, Sellers represented to Plaintiff Cophaz that the debt that the Purchased Entity had with Defendant Jorge Larach had been assigned to Seller Enrique Larach pursuant to an assignment agreement. Sellers further represented to Plaintiff Cophaz that said debt was forgiven by way of a Capitalization Agreement wherein Enrique Larach cancelled and forgave the debt in favor of Impex of Doral, Inc. A copy of the purported assignment is attached as Exhibit C hereto.A copy of the capitalization document purporting to cancel and forgive the debt is attached as Exhibit D hereto.

30. On May 27, 2016, Plaintiffs sent a Notice of Loss and Claim for Indemnification to Defendants pursuant to the SPA. A true and correct copy of the Notice of Loss and Claim for Indemnification is attached as Exhibit E hereto.

31. On June 7, 2016, Plaintiffs sent an Amended Notice of Loss and Claim for Indemnification to Defendants pursuant to the SPA. A true and correct copy of the Notice of Loss and Claim for Indemnification is attached as Exhibit F hereto.

32. Plaintiffs have retained the Recalde Law Firm, P.A. (RLF) to represent them in this action and are obligated to pay RLF a reasonable fee for its services.

---

[1] Exhibit B is the complete copy of all documents received by Impex of Doral, Inc. from attorney Matias R. Dorta, Esq.The Demand Letter's exhibits were incomplete as attached to Matias R. Dorta's letter.

Our File Number: R626

33. All conditions precedent to the filing of this action have been performed, have occurred, or have been waived.

<u>**COUNT I- BREACH OF CONTRACT**</u>
<u>**AS TO DEFENDANTS JARDIM USA, LLC, ENRIQUE LARACH, and LUIS**</u>
<u>**MIGUEL PANDO**</u>

34. The Plaintiffs re-allege and re-aver the allegations contained in paragraphs 1 through 33, and incorporate them herein as though fully set forth.

35. Plaintiff Cophaz fully performed its obligations under the SPA.

36. Sellers, on the other hand, failed in performing their obligations under the SPA. In breach of the SPA, Sellers made representations and warranties that were false at the time of the making of the SPA and at the time of the closing of the transaction between the Parties.

37. In the SPA, the Sellers make the following representations and warranties:

> That "the Financial Statements, taken as a whole, fairly present the financial condition of the Company in all material respects as of the respective dates and for the periods indicated." (Section 3.08(ii)).

> That "[t]he Company has no liability of any nature, except (i) as disclosed, reflected or reserved against in the Financial Statements, (ii) for the Related Party Indebtedness, (iii) for Liabilities incurred in the Ordinary Course of Business and consistent with past practices since September 30, 2013." (Section 3.09).

> That "[t]here are no Liabilities of the Company of a nature required to be reflected on a balance sheet prepared in accordance with GAAP, other than Liabilities (a) reflected or reserved against on the Interim Balance Sheet, (b) incurred since the date of the Interim Balance Sheet in the Ordinary Course of Business." (Section 3.10).

> That Section 3.20(a) of the Disclosure Schedule lists each of the Contracts to which the Company is a party, including "any Contract or group of Contracts with the same or affiliated counterparties that provide(s) for the payment or receipt by the Company of money, services or property with an aggregate annual value in excess of $50,000;" and "any Contract or group of Contracts with the same or affiliated counterparties under which the Company created, incurred, assumed or guaranteed any indebtedness in excess of $50,000 or under which there has been imposed a security interest on any of the assets, tangible or intangible, of the Company." (Section 3.20).

Our File Number: R626

38. In violation of Article 3 of the SPA, the representation and warranty of the Sellers that "the Financial Statements, taken as a whole, fairly present the financial condition of the Company in all material respects" was breached by Sellers because the debt secured by the Note (the "Liability") was not disclosed as a Liability on the Financial Statements.

39. The representation and warranty by the Sellers that "[t]he Company has no liability of any nature, except (i) as disclosed, reflected or reserved against in the Financial Statements, (ii) for the Related Party Indebtedness, (iii) for Liabilities incurred in the Ordinary Course of Business" was breached by Sellers because the debt secured by the Note was not disclosed, reflected or reserved against in the Financial Statements, nor was it for the Related Party Indebtedness as defined in the SPA, nor is this claim a Liability incurred in the ordinary course of business.

40. Furthermore, this Liability should have been reflected on the balance sheet as a debt/liability in accordance with Generally Accepted Accounting Principles ("GAAP"). As such, Sellers breached the representation and warranty that "[t]here are no Liabilities of the Company of a nature required to be reflected on a balance sheet prepared in accordance with GAAP, other than Liabilities (a) reflected or reserved against on the Interim Balance Sheet, (b) incurred since the date of the Interim Balance Sheet in the Ordinary Course of Business.

41. The Note securing the debt was not listed on the Disclosure Schedule, even though it is a Contract under which the Company incurred an indebtedness far in excess of $50,000.00. The Sellers therefore breached the representation and warranty that such disclosure was made, when in fact it was not.

Our File Number: R626

42. Each of the above-referenced representations and warranties have been breached by the Sellers. The Sellers misrepresented the aforementioned debt as having been assigned, forgiven and cancelled pursuant to a capitalization agreement. However, based on the attached demand letter, it appears that the debt was never assigned or forgiven. The failure to disclose this as a Liability amounts to a breach of representations and warranties under the SPA.

43. Accordingly, Plaintiff Cophaz brings this breach of contract claim, based on Sellers' breaches of Article 3 of the SPA, and seeks damages.

**WHEREFORE**, Plaintiff Cophaz moves this Honorable Court for any and all of the following relief:

    a. Compensatory, consequential and general damages in an amount to be determined at trial;

    b. Reasonable attorney's fees and costs pursuant to Section 7.02 of the SPA, and where appropriate;

    c. Pre- and Post-judgment interest; and

    d. Any and all other relief that this Court deems appropriate under the circumstances.

<u>**COUNT II: FRAUDULENT [INTENTIONAL] MISREPRESENTATION AS TO DEFENDANTS JARDIM USA, LLC, ENRIQUE LARACH, and LUIS MIGUEL PANDO**</u>

44. The Plaintiffs re-allege and re-aver the allegations contained in paragraphs 1 through 33, and incorporate them herein as though fully set forth.

45. The Sellers intentionally made false statements to Plaintiff Cophaz concerning material facts and omitted material facts—despite having a duty to Cophaz to disclose them—

Our File Number: R626

concerning the Purchased Entity's Liabilities. Additionally, Sellers misrepresented the true value of the Purchased Entity to Cophaz during the pre-acquisition process of negotiations and due diligence.

46. The Sellers made such misrepresentations and material omissions to deceive Cophaz and to induce Cophaz to rely upon said misrepresentations and material omissions so Cophaz would, among other things, enter into the Agreement with the Sellers in the first place, and to pay theconsideration contemplated therein.

47. Cophaz reasonably relied on the Sellers' intentional misrepresentations and material omissions to its detriment, and would not have entered into the SPA or paid the consideration contemplated therein had Sellers not made them.

48. As a direct and proximate result of its reliance of Sellers' intentional misrepresentations and material omissions, Cophaz has suffered and will continue to suffer significant financial and other losses, including a loss equivalent to the Claim.

**WHEREFORE**, Plaintiff Cophaz moves this Honorable Court for any and all of the following relief:

     a. Compensatory, consequential and general damages in an amount to be determined at trial;

     b. Reasonable attorney's fees and costs pursuant to Section 7.02 of the SPA, and where appropriate;

     c. Pre- and Post-judgment interest; and

     d. Any and all other relief that this Court deems appropriate under the circumstances.

Our File Number: R626

## <u>COUNT III: NEGLIGENT MISREPRESENTATION</u><br><u>AS TO DEFENDANTS JARDIM USA, LLC, ENRIQUE LARACH, and LUIS</u><br><u>MIGUEL PANDO</u>

49. The Plaintiffs re-allege and re-aver the allegations contained in paragraphs 1 through 33, and incorporate them herein as though fully set forth.

50. During the pre-acquisition process of negotiation and due diligence, the Sellers made false statements to Cophaz concerning material facts and failed to disclose material facts to Cophaz concerning the Purchased Entity's true value, including its outstanding liabilities.

51. These misrepresentations and material omissions were false, misleading, and detrimental to Cophaz. Sellers knew or reasonably should have known that such misrepresentations and material omissions were false, misleading, and detrimental to Cophaz at the time they were made.

52. Cophaz would not have entered into the SPA if Sellers had not made the misrepresentations and material omissions described herein.

53. Sellers were negligent in making such misrepresentations and material omissions because they knew or reasonably should have known that such misrepresentations and material omissions were false, misleading, and detrimental to Cophaz.

54. Cophaz reasonably and justifiably relied on Sellers' misrepresentations and material omissions to its detriment.

55. As a direct and proximate result of its reliance on Sellers' negligent misrepresentations and material omissions, Cophaz has suffered and will continue to suffer significant financial and other losses, including a loss in an amount equivalent to the amount of the Claim.

Our File Number: R626

**WHEREFORE**, Plaintiff Cophaz moves this Honorable Court for any and all of the following relief:

   a.  Compensatory, consequential and general damages in an amount to be determined at trial;

   b.  Reasonable attorney's fees and costs pursuant to Section 7.02 of the SPA, and where appropriate;

   c.  Pre- and Post-judgment interest; and

   d.  Any and all other relief that this Court deems appropriate under the circumstances.

## COUNT IV: VIOLATION OF FLORIDA SECURITIES AND INVESTOR PROTECTION ACTAS TO DEFENDANTS JARDIM USA, LLC, ENRIQUE LARACH, LUIS MIGUEL PANDO, TRIANGLE PARTNERS, INC., AND LUIS TORREGO

56. The Plaintiffs re-allege and re-aver the allegations contained in paragraphs 1 through 33, and incorporate them herein as though fully set forth.

57. Sellers and the Defendants Triangle Partners, Inc. and Luis Torrego, have violated the Florida Securities and Investor Protection Act, Chapter 517, Florida Statutes (the "FSIPA").

58. Specifically, Section 5.17.301(1)(a)(1)-(3) of the FSIPA prohibits the following acts in "*connection with the rendering of any investment advice or in connection with the offer, sale, or purchase of any investment or security*":

   a.  To employ any device, scheme, or artifice to defraud;

   b.  To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements

Our File Number: R626

made, in light of the circumstances under which they were made, not misleading; or

    c.   To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

59. The Sellers' and the Defendants Triangle Partners, Inc. and Luis Torrego'snegotiation and sale of the Purchased Entity to Cophaz constitutes an "offer" and "sale" of an "investment" or "security" within the meaning of FSIPA.

60. The Sellers and the Defendants Triangle Partners, Inc. and Luis Torrego, while participating and assisting in the offer for sale of the Purchased Entity to Cophaz, committed violations of the FSIPA by making intentionally false statements concerning material facts and/or intentionally failing to disclose material facts to Cophaz with respect to the Purchased Entity's true value, including its outstanding liabilities. Such actions violate at least three provisions of the FSIPA because, within the meaning of FSIPA Section 5.17.301(1)(a), such actions constitute "(1) deploying a device, scheme, or artifice to defraud"; "(2) obtaining money or property by means of untrue statements of material fact and omissions to state material facts necessary to make these statements made, in light of the circumstances under which they were made, not misleading"; and "(3) engaging in a transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person."

61. Sellers and Defendants Triangle Partners, Inc. and Luis Torrego had full knowledge that their misrepresentations and material omissions were false and/or misleading to Cophaz.

62. Sellers and Defendants Triangle Partners, Inc. and Luis Torregomade such misrepresentations and material omissions with the intention of inducing Cophaz to act in

Our File Number: R626

reliance thereon, by, among other things, entering into the SPA with the Sellers in the first instance.

63. Cophaz would not have entered into the SPA had Sellers not made such misrepresentations and material omissions.

64. Cophaz acquired the Purchased Entity from Sellers in reasonable reliance on Sellers' misrepresentations and material omissions, all of which Sellers made to defraud and deceive Cophaz.

65. As a direct and proximate result of Sellers' violations of the FSIPA, Cophaz has sustained significant damages, recoverable under the FSIPA, including a loss in an amount equivalent to the amount of the Claim.

**WHEREFORE**, Plaintiff Cophaz moves this Honorable Court for any and all of the following relief:

    a.  Compensatory, consequential and general damages in an amount to be determined at trial;

    b.  Reasonable attorney's fees and costs pursuant to Section 7.02 of the SPA, and where appropriate;

    c.  Pre- and Post-judgment interest; and

    d.  Any and all other relief that this Court deems appropriate under the circumstances.

## COUNT V: DECLARATORY JUDGMENT
## AS TO DEFENDANTS JARDIM USA, LLC, ENRIQUE LARACH, LUIS MIGUEL PANDO

66. The Plaintiffs re-allege and re-aver the allegations contained in paragraphs 1 through 33, and incorporate them herein as though fully set forth.

67. Plaintiffs Cophazand Impexbring a claim for declaratory relief pursuant to Chapter 86, Florida Statutes.A justiciable controversy exists between Cophaz, Impex, and Sellers which is ripe and appropriate for declaratory judgment under Florida law.

68. Declaratory relief is necessary to afford Cophaz and Impex relief from uncertainty and insecurity with respect to its rights and status regarding a) the Earn-Out Payment under the SPA that would be payable, but for the misrepresentations of Sellers, and b)Cophaz and Impex's resulting claim for Indemnification.

69. Cophaz asks the Court to declare that, pursuant to the SPA: (1) Cophaz and Impex are entitled to indemnity from Sellers for the full amount of the loss referenced herein; and (2) Cophaz may deduct the loss of the debt secured by the Note referenced hereinand related charges from the Earn-Out Payment.

70. Article VII, Section 7.02 of the SPA provides:

> the Purchaser and its Affiliates and their respective officers, directors, employees, agents, successors and assigns (each a "Purchaser Indemnified Party") **shall be indemnified and held harmless for and against all losses**, damages, claims, costs and expenses, interest, awards, judgments and penalties (including reasonable attorneys' and consultants' fees and expenses) actually suffered or incurred by them (hereinafter a "Loss") by each Seller and Pando for Losses (i) **arising out of or resulting from any breach of a representation or warranty made by such Seller in Article III of this Agreement**; . . . Notwithstanding the foregoing, in the event either JUSA or Larach fails to satisfy its obligation hereunder, then the aggregate amount due hereunder shall be deemed, as to Purchaser, to be a joint and several obligation of JUSA, Larach, and Pando, **and Purchaser shall be entitled to deduct such amount from or set such amount off against any further payment obligations of Purchaser arising under this Agreement, including but not limited to Purchaser's obligations in respect of the Transitional Compliance Payment and the Earn-Out Payment.**

(emphasis added).

Page **15** of **20**

Our File Number: R626

71. The debt referenced in the Note attached hereto is an expense actually incurred by

Purchaser (Cophaz) and by Purchaser's affiliate (Impex), and therefore constitutes a Loss

subject to indemnification pursuant to Section 7.02 of the SPA.

72. In Article III of the SPA, the Sellers made certain representations and warranties

regarding the financial condition of the Purchased Entity.

73. Specifically, the Sellers make the following representations and warranties:

That "the Financial Statements, taken as a whole, fairly present the financial condition of the Company in all material respects as of the respective dates and for the periods indicated." (Section 3.08(ii)).

That "[t]he Company has no liability of any nature, except (i) as disclosed, reflected or reserved against in the Financial Statements, (ii) for the Related Party Indebtedness, (iii) for Liabilities incurred in the Ordinary Course of Business and consistent with past practices since September 30, 2013." (Section 3.09).

That "[t]here are no Liabilities of the Company of a nature required to be reflected on a balance sheet prepared in accordance with GAAP, other than Liabilities (a) reflected or reserved against on the Interim Balance Sheet, (b) incurred since the date of the Interim Balance Sheet in the Ordinary Course of Business." (Section 3.10).

That Section 3.20(a) of the Disclosure Schedule lists each of the Contracts to which the Company is a party, including "any Contract or group of Contracts with the same or affiliated counterparties that provide(s) for the payment or receipt by the Company of money, services or property with an aggregate annual value in excess of $50,000;" and "any Contract or group of Contracts with the same or affiliated counterparties under which the Company created, incurred, assumed or guaranteed any indebtedness in excess of $50,000 or under which there has been imposed a security interest on any of the assets, tangible or intangible, of the Company." (Section 3.20).

74. In violation of Article 3 of the SPA, the financial condition of the Company was not

fairly represented in the Financial Statements because the debt secured by the Note (the

"Liability") was not disclosed as a debt in those Financial Statements. The Liability was

not disclosed, reflected or reserved against in the Financial Statements, nor is it for the

Related Party Indebtedness, nor is it for Liabilities incurred in the ordinary course of

Our File Number: R626

business. Furthermore, this Liability should have been reflected on the balance sheet as a debt/liability in accordance with GAAP. The Note securing the debt was not listed on the Disclosure Schedule, even though it is a Contract under which the Company incurred an indebtedness far in excess of $50,000.00.

75. Thus, each of the above-referenced representations and warranties have been breached by the Sellers. The Sellers misrepresented this debt as having been assigned, forgiven and cancelled pursuant to a capitalization agreement. However, based on the attached demand letter, it appears that the debt was never assigned or forgiven. The failure to disclose this as a Liability amounts to a breach of representations and warranties under Article III of the SPA.

**WHEREFORE**, Plaintiffs, Cophaz and Impex, being without remedy save in a court of equity, move this Honorable Court for the following relief:

a.   That upon final hearing the Court enter a declaration and determination that Sellers breached their representations and warranties made in the SPA;

b.   That, pursuant to the SPA, the Plaintiffs are entitled to indemnity from Sellers for the full amount of the Loss resulting from the claim of Jorge Larach;

c.   That upon final hearing the Court enter a declaration and determination that Plaintiffs are entitled to deduct the loss of the debt secured by the Note referenced herein and related charges from the Earn-Out Payment.

d.   For an award of attorneys' fees and costs pursuant to Section 7.02 of the SPA.

e.   Pre- and Post-judgment interest.

f.   For any and all further relief as this Court deems appropriate under the circumstances.

Our File Number: R626

## COUNT VI: DECLARATORY JUDGMENT AS TO JORGE LARACH

76. The Plaintiffs re-allege and re-aver the allegations contained in paragraphs 1 through 33, and incorporate them herein as though fully set forth.

77. Plaintiffs Cophaz and Impex bring a claim for declaratory relief pursuant to Chapter 86, Florida Statutes.A justiciable controversy exists between Cophaz, Impex, and Jorge Larach, which is ripe and appropriate for declaratory judgment under Florida law.

78. Declaratory relief is necessary to afford Cophaz and Impex relief from uncertainty and insecurity with respect to its rights and status regarding the validity of the Claim and resulting liability of the Company referenced herein.

79. Cophaz asks the Court to declare that either (1) the promissory note referenced herein was effectively assigned, capitalized and cancelled, and as such, does not constitute a liability of the Company; or (2) the promissory note securing the debt is valid, was not assigned, and does constitute a liability of the Company.

80. Prior to Plaintiff's acquisition of the Company from Sellers, the promissory note was disclosed to the Plaintiffs. However, it was disclosed as being assigned to Seller Enrique Larach, and capitalized into the Company. As such, the promissory note was not considered a debt of the Company at the time of acquisition. A true and correct copy of the Assignment and Capitalization Agreement provided to Plaintiff Cophaz are attached hereto as <u>Exhibits C and D</u> respectively.

81. However, on or about May 13, 2016, Plaintiffs received a copy of the Notice/Demand Letter attached as <u>Exhibit B</u> hereto, claiming that there has been a default in payment of the debt secured by the promissory note, and demanding payment of the balance.

Our File Number: R626

82. Defendant Jorge Larach, through his counsel, has indicated that they are not aware of any assignment or capitalization of the debt.

83. As such, there is a disagreement as to the status of the Claim.

**WHEREFORE**, Plaintiffs, Cophaz and Impex, being without remedy save in a court of equity, move this Honorable Court for the following relief:

    a.   That upon final hearing the Court enter a declaration and determination as to whether the promissory note securing the debt on behalf of Defendant Jorge Larach is a valid liability of the Company, or whether the promissory was effectively assigned and capitalized into the Company.

## COUNT VII: EQUITABLE RESCISSION OF CONTRACT

84. The Plaintiffs re-allege and re-aver the allegations contained in paragraphs 1 through 33, and incorporate them herein as though fully set forth.

85. The elements of a cause of action for rescission or cancellation of a contract are: (1) the character or relationship of the parties; (2) the making of the contract; (3) the existence of fraud, mutual mistake, false representations, impossibility of performance, or other ground for rescission or cancellation; (4) that the party seeking rescission has rescinded the contract and notified the other party to the contract of such rescission; (5) if the moving party has received benefits from the contract, he should further allege an offer to restore these benefits to the party furnishing them, if restoration is possible; and (6) that the moving party has no adequate remedy at law. *Crown Ice Mach. Leasing Co. v. Sam Senter Farms, Inc.*, 174 So. 2d 614, 617 (Fla. 2d DCA 1965).

86. The Sellers induced Plaintiffs to enter into the SPA through fraud and false representations of material fact. Specifically, the Sellers misrepresented to Plaintiff

Our File Number: R626

Cophaz that the debt that the Purchased Entity had with Defendant Jorge Larach had been assigned to Seller Enrique Larach pursuant to an assignment agreement, and further misrepresented to Plaintiff Cophaz that said debt was forgiven by way of a Capitalization Agreement wherein Enrique Larach cancelled and forgave the debt in favor of Impex of Doral, Inc.

87. The Sellers intended that the Plaintiff Cophaz rely on their representations regarding the financial condition of the Company, including all outstanding liabilities, as evidenced by their representations and warranties in Article 3 of the SPA.

88. Plaintiff Cophaz reasonably relied on the Sellers' representations.

89. Because the Sellers perpetrated a fraud on Plaintiff Cophaz, inducing it to enter into the SPA through false representations of material facts regarding the transaction, Plaintiff asks that this Court exercise its equitable powers to rescind the SPA. In addition, Plaintiffs request the return and repayment by the Sellers of all monies and property conveyed by Plaintiff in consideration of the SPA, including but not limited to the purchase price of $3,917,735.00. Because monetary damages alone are insufficient to compensate for the harm Plaintiffs have suffered, Plaintiff prays for equitable relief.

**WHEREFORE**, Plaintiffs, Cophaz and Impex, being without remedy save in a court of equity, move this Honorable Court for the following relief:

a. That upon final hearing the Court enter a declaration and determination rescinding the Share Purchase Agreement;

b. Ordering the return of all monies and property paid in consideration of the SPA to Plaintiffs;

c. For an award of attorneys' fees pursuant to Section 7.02 of the SPA;

Our File Number: R626

d. Pre- and Post-judgment interest; and

e. For other and further relief as this Court deems appropriate under the circumstances.

RECALDE LAW FIRM, P.A.
*Attorneys for Plaintiffs*
10800 Biscayne Blvd, Suite 988
Miami, FL 33161
Ph: 305-792-9100
eFax: 1-305-517-1407
By:
Rafael Recalde, Esq.
FBN: 60040
Primary Email: pleadings@recaldelaw.com
Secondary Email: mercedes@recaldelaw.com

Dated: June 27, 2016

Our File Number: R626

# EXHIBIT "A"

_____

STOCK PURCHASE AGREEMENT

_____

by and among

ENRIQUE LARACH

LUIS MIGUEL PANDO

JARDIM USA, LLC

IMPEX OF DORAL, INC.

IRELA LARACH

and

COPHAZ INVESTMENT INC

Dated as of November18, 2013

MIADOCS 8389889 8

**ARTICLE I DEFINITIONS** ........................................................................................................ 1

    SECTION 1.01   Certain Defined Terms ............................................................. 1
    SECTION 1.02   Definitions ................................................................................ 8
    SECTION 1.03   Interpretation and Rules of Construction ................................ 9

**ARTICLE II PURCHASE AND SALE** ................................................................................. 10

    SECTION 2.01   Purchase and Sale of the Shares ............................................ 10
    SECTION 2.02   Closing ................................................................................... 10
    SECTION 2.03   Closing Deliveries by the Sellers .......................................... 11
    SECTION 2.04   Closing Deliveries by the Purchaser ..................................... 11
    SECTION 2.05   Purchase Price ........................................................................ 12
    SECTION 2.06   Post-Closing Adjustment to the Closing Date Payment........ 13
    SECTION 2.07   Earn-Out Payment .................................................................. 16

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLERS** ............. 18

    SECTION 3.01   Organization, Authority and Qualification of the Sellers........... 18
    SECTION 3.02   No Conflict ............................................................................. 19
    SECTION 3.03   Shares ..................................................................................... 19
    SECTION 3.04   Organization, Authority and Qualification............................. 19
    SECTION 3.05   Capitalization.......................................................................... 19
    SECTION 3.06   No Conflict ............................................................................. 20
    SECTION 3.07   Governmental Consents and Approvals ................................. 20
    SECTION 3.08   Financial Information ............................................................. 20
    SECTION 3.09   Absence of Changes ............................................................... 20
    SECTION 3.10   Conduct in the Ordinary Course ............................................ 21
    SECTION 3.11   Litigation ................................................................................ 22
    SECTION 3.12   Compliance with Laws........................................................... 22
    SECTION 3.13   Intellectual Property ............................................................... 23
    SECTION 3.15   Real Property .......................................................................... 24
    SECTION 3.16   Employee Benefit Matters...................................................... 24
    SECTION 3.17   Labor Matters ......................................................................... 24
    SECTION 3.18   Taxes ...................................................................................... 25
    SECTION 3.19   Material Contracts .................................................................. 25
    SECTION 3.20   Environmental Matters ........................................................... 26
    SECTION 3.21   Insurance ................................................................................ 26
    SECTION 3.22   Transactions with Affiliates .................................................. 26
    SECTION 3.23   No Brokers ............................................................................. 26
    SECTION 3.24   Suppliers ................................................................................ 27
    SECTION 3.25   Customers ............................................................................... 27
    SECTION 3.26   Disposition of Assets ............................................................. 27
    SECTION 3.26    No Further Representations and Warranties ........................... 27

**ARTICLE IV** .......................................................................................................................... 27

**REPRESENTATIONS AND WARRANTIES OF THE PURCHASER** ............................... 27

    SECTION 4.01    Organization and Authority of the Purchaser........................... 27
    SECTION 4.02   No Conflict ............................................................................. 28

SECTION 4.03    Governmental Consents and Approvals ...................................................... 28
SECTION 4.04    Financing .................................................................................................... 28
SECTION 4.05    Litigation .................................................................................................... 28
SECTION 4.07    No Further Representations and Warranties ............................................... 29

**ARTICLE V ADDITIONAL AGREEMENTS** ....................................................................... **29**

SECTION 5.01    Access to Information .................................................................................. 29
SECTION 5.02    Further Action ............................................................................................ 29
SECTION 5.04    Release of Guarantees ................................................................................ 30
.................................................................................................................................................... 30
SECTION 5.05    Non-Competition and Confidentiality......................................................... 31

**ARTICLE V I TAX MATTERS** ............................................................................................... **31**

6.01     Tax Indemnities .......................................................................................................... 31
SECTION 6.02    Tax Refunds and Tax Benefits ................................................................... 31
SECTION 6.03    Preparation of Tax Returns......................................................................... 31
SECTION 6.04    Tax Cooperation and Exchange of Information .......................................... 33
SECTION 6.05    Contests ...................................................................................................... 33
SECTION 6.06    Conveyance Taxes....................................................................................... 34
SECTION 6.07    Tax Covenants ............................................................................................ 34
SECTION 6.08    Miscellaneous ............................................................................................. 34

**ARTICLE VI I INDEMNIFICATION** ..................................................................................... **35**

SECTION 7.01    Survival of Representations, Warranties and Covenants ............................ 35
SECTION 7.02    Indemnification by the Sellers and Pando .................................................. 35
SECTION 7.04    Indemnification by the Purchaser ............................................................... 36
SECTION 7.05    Limits on Indemnification .......................................................................... 36
SECTION 7.06    Notice of Loss; Third Party Claims............................................................. 37
SECTION 7.07    Remedies ..................................................................................................... 38

**ARTICLE VII I GENERAL PROVISIONS** ........................................................................... **38**

SECTION 8.01    Expenses ...................................................................................................... 38
SECTION 8.02    Notices......................................................................................................... 38
SECTION 8.03    Public Announcements................................................................................. 41
SECTION 8.04    Severability.................................................................................................. 41
SECTION 8.05    Entire Agreement ........................................................................................ 41
SECTION 8.06    Assignment .................................................................................................. 41
SECTION 8.07    Amendment .................................................................................................. 41
SECTION 8.08    Waiver ......................................................................................................... 42
SECTION 8.09    No Third Party Beneficiaries....................................................................... 42
SECTION 8.10    Specific Performance .................................................................................. 42
SECTION 8.11    Governing Law............................................................................................. 42
SECTION 8.12    Waiver of Jury Trial .................................................................................... 43
SECTION 8.13    Conflict of Interest ...................................................................................... 43
SECTION 8.14    Counterparts ................................................................................................ 43
SECTION 8.15    Currency ...................................................................................................... 43

ANNEXES

Annex I – Shares

Annex II – Closing Date Payment

EXHIBITS

Exhibit A - Shareholder Non-Compete and Confidentiality Agreements

Exhibit B – Guarantee of Zaimella del Ecuador S.A.

Exhibit C - Transitional Compliance Payment Escrow Agreement

Exhibit D - Registered Company Intellectual Property certificates


DISCLOSURE SCHEDULES

Section 1.01(b)(i)(B) – Related Party Indebtedness

Section 3.02 – Governmental Consents and Approvals

Section 3.08 – Financial Statements

Section 3.11 – Exceptions to Ordinary Course

Section 3.14 – Registered Company Intellectual Property

Section 3.16(a) and (b) – Real Property

Section 3.16(a)(ii)– Permitted Encumbrances

Section 3.20(a) – Material Contracts

Section 3.25 – Suppliers

Section 3.26 – Customers

Section 5.04 – Guarantees

**THIS STOCK PURCHASE AGREEMENT**, (this "Agreement") dated as of November 18, 2013, (the "Agreement Date") is made by and among IMPEX OF DORAL, INC., a Florida corporation (the "Company"), ENRIQUE LARACH, an individual, residing in the United States of America ("Larach"), JARDIM USA, LLC, a Florida limited liability company ("JUSA")),hereinaftereach, a "Seller" and collectively, the "Sellers"; and COPHAZ Investment Inc., a company formed under the laws of Panama ("Purchaser"), and Luis Miguel Pando, an individual, residing in Dominican Republic ("Pando"), and, solely for the purpose of agreeing to the portions of Sections 5.03 and 2.05(b) that are expressly applicable to her, Irela Larach, an individual residing in the United States of America ("Irela Larach").

W I T N E S S E T H:

WHEREAS, the Sellers own, collectively, all of the issued and outstanding shares of common stock of the Company (the "Shares"), with E. Larach owning twenty-eight (28) Shares constituting twenty-eight percent (28%) of the issued and outstanding capital stock of the Company and JUSA owning seventy-two (72) Sharesconstituting seventy-two percent (72%) of the issued and outstanding capital stock of the Company;

WHEREAS, the Company carries on the business of manufacturing, packaging, marketing and selling of disposable baby diapers, training pants, baby wet wipes, adult incontinence products and sanitary napkins (the "Subject Business");

WHEREAS, the Sellers wish to sell to the Purchaser, and the Purchaser wishes to purchase from the Sellers, the Shares, constituting one hundred percent (100%) of the issued and outstanding capital stock of the Company, upon the terms and subject to the conditions set forth herein; and

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants hereinafter set forth, and intending to be legally bound, the Company, the Sellers and the Purchaser hereby agree as follows:

## ARTICLE I
## DEFINITIONS

SECTION 1.01        Certain Defined Terms.  For purposes of this Agreement:

"Action" means any claim, action, suit, arbitration, inquiry, proceeding or investigation by or before any Governmental Authority.

"Adjusted Closing Date Payment" means an amount equal to the Closing Date Payment as adjusted and determined by the Parties pursuant to the procedures set forth in Section 2.06.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified Person and, with respect to the Purchaser, includes the Company from and after the Closing.

"Audited Financial Statements" means the audited balance sheet of the Company as of December 31, 2012 and the related statements of income, retained earnings and cash flows for the fiscal years then ended, together with the audit opinions of the Company's auditors with respect thereto.

"Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in the city of Miami, Florida.

"Cash" means cash and cash equivalents of the Company, calculated in accordance with GAAP.

"Claims" means any and all administrative, regulatory or judicial actions, suits, petitions, appeals, demands, demand letters, claims, liens, notices of intent to lien, notices of non-compliance or violation, investigations, proceedings, consent orders or consent agreements.

"Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly, or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by Contract, credit arrangement or otherwise.

"Contract" means any note, bond, mortgage, deed of trust, indenture, guarantee, lease, sublease, license, franchise, permit, agreement, understanding, arrangement, contract, commitment, or other legally binding instrument or obligation (whether oral or written).

"Company Employee" means as at the time of determination, an employee of the Company.

"Company Intellectual Property" means all Intellectual Property owned by the Company that is material to the operations of the Company as currently conducted as set forth in Section 3.14 of the Disclosure Schedules.

"Company IP Agreements" means all licenses of Intellectual Property (a) from the Company to any third party, excluding licenses to customers and end users granted in the Ordinary Course of Business, and (b) to the Company from any third party, excluding Intellectual Property licensed to the Company pursuant to any "shrink-wrap" or "click-wrap" license or any license concerning generally commercially available software.

"Conveyance Taxes" means any sales, use, transfer, conveyance, value added, ad valorem, stamp, stamp duty, recording or other similar tax, fee or charge imposed by any Governmental Authority upon the sale, transfer or assignment of real, personal, tangible or intangible property or any interest therein, or upon the recording of any such sale, transfer or assignment, together with any interest, additions or penalties in respect thereof.  For purposes

hereof, any taxes imposed on the Sellers for the sale of shares of the Company, including, without limitation, capital gains taxes, are excluded from the definition of Conveyance Taxes.

"Disclosure Schedule" means the Disclosure Schedule, dated as of the date of this Agreement, delivered by the Company to the Purchaser in connection with the execution and delivery of, and forming a part of, this Agreement.

"EBITDA" means, for the applicable period, earnings of the Subject Business and any other business conducted by the Company following the Closing, before interest, income taxes, depreciation and amortization, each item determined in accordance with GAAP.

"Employee Benefit Plan" means all employee benefit plans and all bonus, stock option, stock purchase, restricted stock, incentive, deferred compensation, retiree medical or life insurance, supplemental retirement, severance or other benefit plans, programs or arrangements and all employment, termination, severance or other Contracts or agreements other than statutory benefits, to which the Company is a party, with respect to which the Company has any obligation or which are maintained, contributed to or sponsored by the Company for the benefit of any current or former employee, officer or director of the Company, and each employee benefit plan or arrangement for which the Company could otherwise incur liability.

"Encumbrance" means any security interest, pledge, hypothecation, mortgage, deed of trust, lien or encumbrance, other than any license of, option to license, or covenant not to assert claims of infringement, misappropriation or other violation with respect to, any asset, property, Intellectual Property and/or real property of the Company or the shares that are the subject of this transaction.

"Environmental Claims" means any Claim relating to any Environmental Law or any Environmental Permit, including (a) any and all Claims by Governmental Authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (b) any and all Claims by any Person seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief resulting from the Release of Hazardous Materials.

"Environmental Law" means any Law that relates to (a) pollution or the protection of the environment or (b) human exposure to, or the Release of, Hazardous Materials.

"Environmental Permit" means any permit, approval, identification number or license that the Company is required to possess under Environmental Law.

"Excluded Taxes" means (i) all Taxes imposed on or payable by the Company for any Pre-Closing Period; and (ii) with respect to Straddle Periods, Taxes imposed on the Company which are allocable, pursuant to Section 6.03(c), to the portion of such period ending on the Closing Date; provided, however, that Excluded Taxes shall not include Taxes (A) resulting from any act, transaction or omission of the Purchaser or the Company occurring after the Closing; and (B) attributable to Purchaser's failure to satisfy any of its obligations pursuant to this Agreement.

"Financial Statements" means the Unaudited Financial Statement and the Audited Financial Statements.

"GAAP" means generally accepted accounting principles and practices in effectin the United States of America from time to time.

"Governmental Authority" means any federal, national, supranational, state, provincial, local or other government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body of competent jurisdiction.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Hazardous Material" means (a) petroleum and petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials and polychlorinated biphenyls and (b) any other chemicals, materials or substances defined or regulated as "toxic" or "hazardous" or as a "contaminant" under any applicable Environmental Law.

"Income Tax" means a federal, state, local or foreign Tax that is based upon or measured by overall net or gross income and franchise, capital, net worth and similar Taxes.

"Income Tax Return" means a Tax Return relating to Income Taxes.

"Indebtedness" means, with respect to any Person, (a) all indebtedness of such Person, whether or not contingent, for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services, (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations, contingent or otherwise, of such Person under acceptance, letter of credit or similar facilities (excluding any such obligations issued in support of commercial operations of the Company in the Ordinary Course of Business) and (f) all obligations of such Person to purchase, redeem, retire, defease or otherwise acquire for value any capital stock of such Person or any warrants, rights or options to acquire such capital stock.

"Indemnified Party" means a Purchaser Indemnified Party or a Seller Indemnified Party, as the case may be.

"Indemnifying Party" means the Sellers pursuant to Section 7.02 and the Purchaser pursuant to Section 7.04, as the case may be.

"Intellectual Property" means (a) patents and patent applications, (b) trademarks, service marks, trade names, trade dress and Internet domain names, together with the goodwill associated exclusively therewith, (c) copyrights, including copyrights in computer software, (d) registrations and applications for registration of any of the foregoing in (a)-(c), and (e) trade secrets.

MIADOCS 8389889 8

"Interim Balance Sheet" means the unaudited balance sheet of the Company, as of September 30, 2013.

"Inventory" means the inventory or products of the Company produced or procured in connection with the Subject Business, including work-in-progress.

"Knowledge of the Company" or similar terms used in this Agreement means the actual (but not constructive or imputed) knowledge of Larach and Pando, as of the Closing.

"Law" means any federal, national, supranational, state, provincial, local or administrative statute, law, ordinance, regulation, rule, code, order, requirement or rule of law (including common law).

"Liabilities" means any and all debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or determinable, including those arising under any Law, Action or Governmental Order and those arising under any Contract.

"Material Adverse Effect" means any event, circumstance, change in or effect on the Company that is materially adverse to the results of operations or the financial condition of the Company; provided, however, that none of the following, either alone or in combination, shall be considered in determining whether there has occurred or is likely to occur a "Material Adverse Effect": (a) events, circumstances, changes or effects that generally affect the industries in which the Company operates (including legal and regulatory changes); (b) changes in general economic or political conditions or events, circumstances, changes or effects affecting the securities markets generally; (c) changes arising from the consummation of the transactions contemplated by, or the announcement of the execution of, this Agreement, including (i) any actions of competitors, (ii) any actions taken by or losses of employees or (iii) any delays or cancellations of orders for products or services; (d) any reduction in the price of services or products offered by the Company in response to the reduction in price of comparable services or products offered by a competitor; (e) any event, circumstance, change or effect that results from any action taken pursuant to or in accordance with this Agreement or at request of the Purchaser; (f) changes arising from earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters or weather conditions in the United States or any other country or region in the world; (g) changes caused by a material worsening of current conditions caused by acts of terrorism or war (whether or not declared) occurring after the Closing; and (h) changes or modifications in GAAP or applicable Law or interpretations thereof.

"Ordinary Course of Business" shall mean Ordinary Course as defined in Section 3.11.

"Party" shall mean each of the Company, each of the Sellers and the Purchaser.

"Permitted Encumbrances" means the liens and encumbrances set forth in Section 3.16(a)(ii) of the Disclosure Schedules.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Purchase Price Bank Account" means the following bank account or accounts in the United States which shall receive payments to the Sellers.  Bank accounts shall remain the only destination of payments from the Purchaser and will remain effective unless any Seller communicates a change in writing to the Purchaserfive days in advance of any payment.

The following bank accounts have been initially designated by each Seller:

        a.Larach:

| | |
|---|---|
| Bank name: | Sabadell United Bank |
| | Miami, Florida, U.S.A. |
| ABA or Routing #: | 067 009 646 |
| Swift (for international wires): | S A U B U S 3 M |
| Account name: | ENRIQUE E. LARACH |
| Account #: | 4011381706 |

        b.Jardim USA:

| | |
|---|---|
| Name of the Bank | BANK OF AMERICA |
| Address | MIAMI, FLORIDA |
| ABA | 026009593 |
| SWIFT | BOFAUS3M |
| Master account name: | GTC BANK INC. |
| Master account number: | 1901435064 |

| | |
|---|---|
| FURTHER CREDIT TO: | |
| Amount: | _____ |
| Sub-Account Name: | FILMOR VENTURES CORP |
| Sub-Account Number: | 900059603 |
| Address in Guatemala: | 5ta. Av. 5-55 Zona 14 Europlaza, |
| | Torre 4 Level 5, Guatemala, |
| | Guatemala. |

"Receivables" means any and all accounts receivable, notes and other amounts receivable from third parties, including customers and employees, arising from the conduct of the Subject Business before the Closing, whether or not in the Ordinary Course of Business, together with any unpaid financing charges accrued thereon.

"Registered" means, when used in connection with Intellectual Property matters, issued by, registered or filed with, renewed by or the subject of a pending application before any Governmental Authority or Internet domain name registrar.

"Regulations" means the Treasury Regulations (including Temporary Regulations) promulgated by the United States Department of Treasury with respect to the Code or other federal tax statutes.

"Related Party Indebtedness" means the Indebtedness of the Company under the notes set forth on Section 1.01(b)(i)(B) of the Disclosure Schedules.

"Release" means disposing, discharging, injecting, spilling, leaking, leaching, dumping, emitting, escaping, emptying and seeping into or upon any land or water or air or otherwise entering into the environment.

"Remedial Action" means all action to (a) clean up, remove, treat or handle in any other way Hazardous Materials in the environment, or (b) perform remedial investigations, feasibility studies, corrective actions, closures and post-remedial or post-closure studies, investigations, operations, maintenance or monitoring.

"Sale Transaction" means either (a) the acquisition of the Company by any Person by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation or stock transfer, but excluding any such transaction effected primarily for the purpose of changing the domicile of the Company), unless the Company's stockholders of record immediately prior to such transaction or series of related transactions hold, immediately after such transaction or series of related transactions, at least 50% of the voting power of the surviving or acquiring entity (provided that the sale by the Company of its securities for the sole purpose of raising additional working capital funds shall not constitute a Change-of-Control hereunder) or (b) a sale of all or substantially all of the assets of the Company to any Person that is not an Affiliate of the Company or the Purchaser.

"Seller Percentages" means with respect to each Seller, the percentages of Shares held by such Seller as set forth on Annex I.

"Straddle Period" means any taxable period beginning on or prior to the Closing Date and ending after the Closing Date.

"Subsidiaries" means, with respect to any Person, any other entities in which such Person, directly or indirectly, owns greater than 50% of the equity interests thereof or has the power to elect or direct the election of greater than 50% of the members of the governing body of such entity, or otherwise has control over such entities.

"Tax" or "Taxes" means all income, capital gain, gross receipts, windfall profits, severance, property, production, license, excise, net worth, franchise, capital, employment, withholding, social security contributions and other taxes, duties and similar imposts, however denominated, together with any interest, additions or penalties in respect thereof, imposed by any Governmental Authority, and Conveyance Taxes (excluding, however, Conveyance Taxes described in Section 6.06).

"Tax Returns" means any and all returns, reports and forms (including elections, declarations, amendments, schedules, information returns or attachments thereto) required to be filed with a Governmental Authority with respect to Taxes.

"Third Party Indebtedness" means Indebtedness of the Company other than Related Party Indebtedness.

"Transitional Compliance Payment" has the meaning set forth in Section 2.05(b).

"Transitional Compliance Payment Escrow Agreement" means the escrow agreement referenced in Section 2.04(c).

"Transitional Compliance Payment Escrow Deposit" means the Four-Hundred Thousand Dollars ($400,000.00) of funds deposited with the escrow agent pursuant to and in accordance with the Transitional Compliance Payment Escrow Agreement.

"Transitional Period" has the meaning set forth in Section 5.03.

"Unaudited Financial Statements" means the Interim Balance Sheet and the related statements of income and retained earnings for the nine (9)-month period then ended September 30, 2013.

SECTION 1.02    Definitions.    In addition to the terms defined in Section 1.01, the following defined terms have the meanings set forth in the locations in this Agreement identified below:

| Defined Term | Location |
| --- | --- |
| "Affiliate Contract" | 3.23 |
| "Agreement" | Preamble |
| "Agreement Date" | Preamble |
| "Closing" | 2.02 |
| "Closing Date" | 2.02 |
| "Closing Date Payment" | 2.05(a) |
| "Company" | Preamble |
| "Company Real Property Leases" | 3.16(b) |
| "Contest" | 6.05(b) |
| "Disputed Items" | 2.07(e) |
| "Earn-Out Determination Date" | 2.07(a) |
| "Earn-Out Maximum" | 2.07(a) |
| "Earn-Out Minimum" | 2.07(a) |
| "Earn-Out Objection Notice" | 2.07(d) |
| "Earn-Out Payment" | 2.07 |
| "Earn-Out Statement" | 2.07(d) |
| "Fundamental Representations" | 7.01 |
| "Labor Agreements" | 3.18 |
| "Leased Real Property" | 3.16(b) |
| "Loss" | 7.02 |

| Defined Term | Location |
| --- | --- |
| "Material Contracts" | 3.20(a) |
| "Neutral Accountant" | 2.06(e)(ii) |
| "Notice of Acceptance" | 2.06(c) |
| "Notice of Disagreement" | 2.06(c) |
| "Objection Deadline Date" | 2.06(c) |
| "Owned Real Property" | 3.16(a) |
| "Permit" | 3.13(b) |
| "Preliminary Adjustment Statement" | 2.06(a) |
| "Purchase Price" | 2.05 |
| "Purchaser" | Preamble |
| "Purchaser Indemnified Party" | 7.02 |
| "Purchaser" | Preamble |
| "Seller" | Preamble |
| "Sellers" | Preamble |
| "Seller Indemnified Party" | 7.04 |
| "Shares" | Recitals |
| "Shutts & Bowen" | 8.13 |
| "Subject Business" | Recitals |
| "Third Party Claim" | 7.06(b) |
| "Unresolved Objections" | 2.06(e)(ii) |

SECTION 1.03          Interpretation and Rules of Construction.

(a)       In this Agreement, except to the extent otherwise provided or that the context otherwise requires:

(i)       when a reference is made in this Agreement to an Article, Section, Annex, Schedule or Exhibit, such reference is to an Article or Section of, or an Annex, Schedule or Exhibit to, this Agreement;

(ii)       the table of contents and headings for this Agreement are for reference purposes only and do not in any way affect the meaning or interpretation of this Agreement;

(iii)       whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation";

(iv)       the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement;

(v)       all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein;

(vi)    the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms;

(vii)    each gender-specific term used in this Agreement has a comparable meaning whether used in a masculine, feminine or gender-neutral form;

(viii)    references to a Person are also to its successors and permitted assigns;

(ix)    the use of "or" is not intended to be exclusive unless expressly indicated otherwise; and

(x)    all references to the Purchaser, the Sellers, the Company and their respective Affiliates shall include each of their respective successors.

(b)    The Parties have participated jointly in the negotiation and drafting of this Agreement with sophisticated legal counsel.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provisions of this Agreement.

(c)    Notwithstanding anything to the contrary contained in this Agreement, the information and disclosures contained in any Section of the Disclosure Schedule shall be deemed to be disclosed and incorporated by reference in any other Section of the Disclosure Schedule as though fully set forth in such other section for which such information is applicable.  No reference to or disclosure of any item or other matter in any Section of this Agreement, including any Section of the Disclosure Schedule, shall be construed as an admission or indication that such item or other matter is material or that such item or other matter is required to be referred to or disclosed in this Agreement.  Without limiting the foregoing, no such reference to or disclosure of a possible breach or violation of any contract, Law or Governmental Order shall be construed as an admission or indication that a breach or violation exists or has actually occurred.

## ARTICLE II
## PURCHASE AND SALE

SECTION 2.01    Purchase and Sale of the Shares.  Upon the terms and subject to the conditions of this Agreement, at the Closing, each of the Sellers shall sell to the Purchaser, and the Purchaser shall purchase from each of the Sellers, the Shares set forth opposite such Seller's name under the heading "Shares Owned" on Annex I.

SECTION 2.02    Closing.  Subject to the terms and conditions of this Agreement, the sale and purchase of the Shares contemplated by this Agreement (the "Closing") shall take place at effective at 12:01a.m. on the Agreement Date (the day on which the Closing takes place also being referred to herein as the "Closing Date").

SECTION 2.03     Closing Deliveries by the Sellers.  At the Closing, each of the Sellers shall deliver or cause to be delivered to the Purchaser:

(a)     a copy, duly executed by each Seller, of resolutions duly adopted by the board of directors (or other governing body) and, if required, shareholders of such Seller approving the execution and delivery by such Seller of this Agreement, the sale of such Shares held by such Seller to the Purchaser and the consummation of the transactions contemplated hereby;

(b)     stock certificates representing the Shares, duly endorsed in favor of the Purchaser;

(c)     Resignations of all Directors of the Company;

(d)     Resignation of Luis Torrego as Chief Executive Officer of the Company;

(e)     Post-dated resignations of Enrique Larach and Irela Larach from their non-Director positions with the Company;

(f)     document evidencing the cancellation of any and all existing Shareholder Agreement(s);

(g)     document evidencing that the Sellers agree with the payment structure set forth herein notwithstanding potential inconsistencies with Sellers' share distribution and notwithstanding any existing agreements among shareholders to the contrary, and waive any claims related to such inconsistencies;

(h)     customary pay-off letters from each of the holders of Related Party Indebtedness, in a form reasonably satisfactory to the Purchaser, certifying that all such debts have been fully paid and all encumbrances securing such indebtedness, debts, Related Party Indebtedness, and/or debts owing to such holder shall have been released;

(i)     The Shareholder Non-Compete and Confidentiality Agreements for each of the Sellers, in the form attached as Exhibit A hereto, duly executed by all of Sellers.

(j)     Affidavits, executed by each Seller, individually, adopting by sworn declaration the veracity of the representations and warranties set forth in Article III hereof.

SECTION 2.04     Closing Deliveries by the Purchaser.  At the Closing, the Purchaser shall deliver to:

(a)     The InitialClosing Date Payment;

(b)     documents guaranteeing payment of the Earn-Out Payment and Purchaser's obligations under Section 5.04 by non-party Zaimella del Ecuador S.A., that is attached as Exhibit Bhereto and made an integral part hereof (the "Guarantee"); and

(c)the Transitional Compliance Payment Escrow Deposit in accordance with the Transitional Compliance Payment Escrow Agreement that is attached as Exhibit C hereto and made an integral part hereof.

SECTION 2.05        Purchase Price. The Purchase Price is comprised of the Closing Date Payment, the Transitional Compliance Payment,and the Earn-Out Payment (the "Purchase Price"). The Purchase Price shall be paid to the Sellers, in wire transfers in immediately available funds to the corresponding Purchase Price Bank Account.

(a) The Closing Date Payment basis as per Annex II shall be the amount of Three Million Six Hundred Seventeen Thousand Seven Hundred and Thirty Five Dollars ($3,617,735.00) subject to adjustments pursuant to Section 2.06.  The Closing Date Payment shall be payable in two installments, as set forth herein below, and shall be comprised of the Initial Closing Date Payment of Three Million Five Hundred Seventeen Thousand Seven Hundred Thirty Five Dollars($3,517,735.00) ("Initial Closing Date Payment"), and the Adjusted Closing Date Payment.

The Initial Closing Date Payment shall be paid as follows:

A) to JUSA,the sum of Two Million Five Hundred Forty Five Thousand Seven Hundred Thirty Five Dollars ($2,545,735.00), which sum shall be paid by Purchaser in full to JUSA, but which JUSA will apply first to the payment of certain expenses and third party indebtedness associated with the transaction, next to the repayment of certain Related Party Indebtedness, and finally, the remainder as consideration for sale by JUSA of the Shares owned by it;

B) to Larach,the sum of Nine Hundred and Seventy-Two Thousand Dollars ($972,000.00); and

The Adjusted Closing Date Payment, shall be paid ninety (90) days following the Closing Date, subject to offsets and adjustments in accordance with Section 2.06 and in respect of any amounts owing under Section 2.06 or Articles VI or VII hereof that are due but have not been paid, with a proportional payment as follows:

A) to JUSA, seventy-two percent(72%) of the Adjusted Closing Date Payment; and

B) to Larach, twenty-eight percent(28%) of the Adjusted Closing Date Payment.

(b)        The Transitional Compliance Payment of Four Hundred Thousand Dollars (US$400.000) (the "Transitional Compliance Payment") shall be paid exclusively to Larach ninety (90) days following the Closing Date, subject to strict compliance by Larach and Irela Larach with and in accordance with the terms set forth in Section 5.03 hereto and in the Transitional Compliance Payment Escrow Agreement that is attached as Exhibit C hereto and made an integral part hereof.  Specifically, the parties hereby agree and acknowledge that the

Transitional Compliance Payment shall not be due in the event of non-compliance by Larach or Irela Larach (after notice and an opportunity to cure where applicable in accordance with that section)with any of the provisions or terms set forth in Section 5.03 hereto, and it shall be subject to offsets and adjustments in respect of any amounts owing under Section 2.06 or Articles VI or VII hereof that are due but have not been paid.For the avoidance of doubt, JUSA shall have no interest in the Transitional Compliance Payment and no right to contest or otherwise have input into the amount of the Transitional Compliance Payment.  Any determination as to the Transitional Compliance Payment in accordance with the provisions hereof, or any agreement between Purchaser and Larach as to the amount, calculation, payment or other issue in respect of the Transitional Compliance Payment shall be conclusive and binding on the parties (including JUSA).

(c)      The amount of the Earn-Out Payment shall be paid exclusively to JUSA in accordance with <u>Section 2.07</u>, subject to offsets and adjustments in respect of any amounts owing under Section 2.06 or Articles VI or VII hereof that are due but have not been paid.

SECTION 2.06      <u>Post-Closing Adjustment to the Closing Date Payment</u>. The Closing Date Paymentwas based on the calculation of the Parties set forth on Annex II attached hereto and determined using the Unaudited Financial Statements and using the accounting policies, principles and methodologies used by the Company in the preparation of the Unaudited Financial Statements, consistently applied; provided, however, notwithstanding such calculation, following the Closing the Closing Date Payment shall be subject to adjustment as specified in this <u>Section 2.06</u>:

(a)      For a period of seventy-five (75) days after the Closing Date the Purchaser shall be entitled to conduct a good faith review of the Closing Date Payment, which review shall be limited to (1) verifying the mathematical accuracy of the calculation set forth on Annex II, (2) confirming that the figures set forth in the Unaudited Financial Statements that are reflected in Annex II were determined on the basis of the books and records of the Companyas of September 30, 2013; and, (3) confirming that, to the extent determinative of the figures referenced in Annex II, the Unaudited Financial Statements are materially true and correct and, taken as a whole, fairly represent the financial condition of the Company as of September 30, 2013 and for the nine (9) month period then ended.On or within seventy-five (75) days after the Closing Date, the Purchaser shall prepare and deliver to the Sellers a written statement (the "<u>Preliminary Adjustment Statement</u>") setting forth Purchaser's good faith determination of any adjustments or modifications to the Closing Date Payment resulting from such review and setting forth the "Adjusted Closing Amount", which applies the calculation of Annex II with the updated figures.

(b)      At all reasonable times during the thirty (30) days immediately following the Sellers' receipt of the Preliminary Adjustment Statement, the Sellers and their representatives shall be permitted to review the records, work papers, schedules and other documents of the Purchaser and the Company relating to the Preliminary Adjustment Statement reasonably requested by the Sellers, and the Purchaser shall make reasonably available, on a timely basis, to the Sellers and its representatives the individuals responsible for the preparation of the Preliminary Adjustment Statement in order to respond to the inquiries of the Sellers related thereto.

(c)      The Sellers shall deliver to the Purchaser no later than thirty (30) days after delivery by the Purchaser to the Sellers of the Preliminary Adjustment Statement (the "Objection Deadline Date") either a notice indicating that the Sellersaccept the Preliminary Adjustment Statement ("Notice of Acceptance") or a reasonably detailed statement describing Sellers' objections to the Preliminary Adjustment Statement ("Notice of Disagreement").  If the Sellers do not present any notice, it shall be assumed that the Preliminary Adjustment was accepted.

(d)      If the Sellerstimely deliver a Notice of Acceptance or their silence implies the acceptance of the Preliminary Adjustment Statement, then the Closing Date Payment shall be adjusted pursuant to Section 2.06(f) below. If the Sellers timely deliver a Notice of Disagreement, only those matters specified in such Notice of Disagreement shall be deemed to be in dispute, and all other matters included in the PreliminaryAdjustment Statement shall be final and binding upon the Parties.

(e)      The objections set forth on the Notice of Disagreement shall be resolved as follows:

(i)      The Sellers and the Purchaser shall first use reasonable efforts to resolve such objections and any written resolution by the Sellers and the Purchaser as to such objections shall be final and binding on the Parties.

(ii)      If the Sellers and the Purchaser do not reach a resolution of all objections set forth on the Notice of Disagreement within thirty (30) days after delivery of such Notice of Disagreement, the Sellers and the Purchaser shall, within thirty (30) days following the expiration of such thirty (30)-day period, engage a neutral accounting firm mutually acceptable to the Sellersand the Purchaser who has not performed accounting services for either party or its Affiliates within the preceding twenty-four (24) month period (the "Neutral Accountant"), pursuant to an engagement agreement executed by the Sellers, the Purchaser and the Neutral Accountant, to resolve any objections set forth in the Notice of Disagreement that continue to be unresolved (the "Unresolved Objections").

(iii)      The Neutral Accountant shall be instructed only to resolve the Unresolved Objections and make a final determination of such Unresolved Objections, and not to otherwise investigate such matters independently. The Purchaser and the Sellers shall instruct the Neutral Accountant to make such final determination within thirty (30) days from the date the Unresolved Objections were submitted to the Neutral Accountant and to deliver, to the Purchaser and the Sellers a final determination of the Unresolved Objections which shall, absent manifest error, be final and binding on the parties for purposes of determining the Adjusted Closing Date Payment. During the thirty (30)-day review by the Neutral Accountant, the Purchaser and the Sellers shall each make available to the Neutral Accountant such individuals and such information, books and records as may be reasonably required by the Neutral Accountant to make its final determination of the Unresolved Objections.

(iv)     The Sellers and the Purchaser agree that the procedure set forth in this Section 2.06(e) for resolving disputes with respect to the Preliminary Adjustment Statement shall be the sole and exclusive method for resolving any such disputes concerning adjustments to the Closing Date Payment. The Sellers and Purchaser acknowledge and agree that, notwithstanding the occurrence of the Closing on the Closing Date, the Closing Date Payment,the calculation of the Parties set forth on Annex II attached hereto and the Adjusted Closing Date Payment are based on Unaudited Financial Statements which represent the financial condition of the Company as of September 30, 2013.

(v)     Each of the Parties shall bear its own fees and expenses (including the fees and expenses of its own lawyers, accountants, appraisers and other advisers) in connection the determination of the Unresolved Objections and all fees and expenses of the Neutral Accountant shall be allocated one-half to Purchaser, on the one hand, and one-half to Sellers, on the other hand.

(f)     After the resolution of any Unresolved Objections pursuant to Section 2.06(e) or the delivery by the Sellers of the Notice of Acceptance, as the case may be, the Parties shall execute a written statement setting forth the "Adjusted Closing Date Payment" defined as the Adjusted Closing Amount minus the Initial Closing Date Payment, and within five (5) Business Days after the execution of such statement, if necessary, a payment by wire transfer shall be made as follows:

(vi)     If the Adjusted Closing Amountis *greater than* the Initial Closing Date Payment, then the Purchaser shall pay to the Sellers, in accordance with Section 2.05, the Adjusted Closing Date Payment.

(vii)     If the Adjusted Closing Amount is *less than* the Initial Closing Date Payment, then the Sellers shall refund by wire transfer to a bank account designated by the Purchaser within the following 5 business days, the amount of the difference between the Initial Closing Date Payment and the Adjusted Closing Amount (with seventy-two percent (72%) of such amount paid by JUSA, and twenty-eight percent (28%) of such amount paid by Larach). These aggregate payments are not limited by any amount, except as set forth in Section 7.05.  If unpaid, this amount will be subject to a deduction from future payments to any of the Sellers.

For the avoidance of doubt, the Sellers and Pando agreed amongst themselves that any amount owing from the Sellers resulting from the Adjusted Closing Amount's being less than the Initial Closing Date Payment shall be an obligation of both JUSA and Larach (and not of Pando), with JUSA and Larach being responsible, respectively, for seventy-two percent (72%) and twenty-eight percent (28%) of such obligation.  The foregoing sentence is intended to and shall create a legal obligation of each such party running in favor of the other and in favor of Pando that may be enforced by any lawful means.  Notwithstanding the foregoing, in the event either JUSA or Larach fails to satisfy its obligation hereunder, then the aggregate amount due hereunder shall be deemed, as to Purchaser, to be a joint and several obligation of JUSA, Larach, and Pando, and Purchaser shall be entitled to deduct such amount from or set such amount off against any further payment obligations of Purchaser arising under this Agreement, including but

not limited to Purchaser's obligations in respect of the Transitional Compliance Payment and the Earn-Out Payment.

Also for the avoidance of doubt, in the event that no adjustments are reflected on the Adjustment Statement, the amount of the Adjusted Closing Date Payment will be equal to One-Hundred Thousand Dollars ($100,000), which amount will be paid by the Purchaser to the Sellers.

SECTION 2.07        Earn-Out Payment.    In consideration of the Sellers' delivery of the Shares at Closing, the Purchaser shall pay exclusively to JUSA, as part of the Purchase Price, an amount (the "Earn-Out Payment"), as determined pursuant to and in accordance with this Section 2.07 as follows:

(a)        Subject to the remaining provisions to this Section 2.07, the amount of the Earn-Out Payment shall be calculated as ofDecember 31, 2016(the "Earn-Out Determination Date"), and shall be determined based on the following formula:

Earn Out Payment = Equity Valuetimes 21.6%

whereas,

Equity Value $=6.5 times$ EBITDA for the twelve (12) month period immediately preceding the Earn-Out Determination Date

provided, however, notwithstanding the foregoing calculation, the Earn-Out Payment shall not be less than One Million One Hundred Twenty-One Thousand and Eight Hundred Eighty-Six Dollars ($1,121,886.00) (the "Earn-Out Minimum") or exceedSeven Million Dollars ($7,000,000) (the "Earn-Out Maximum").

The Earn-Out Payment shall be calculated utilizing the audited balance sheet of the Company as Earn-Out Determination Date and the related statements of income and retained earnings for the fiscal year then ended together with the audit opinions of the Company's auditors with respect to the audited financial statements.

(b)        Payment of the Earn-Out, including the minimum amount,shall be subject to offsets and adjustments in respect of any amounts owing under Section 2.06 or Articles VI or VII hereof that are due but have not been paid.

(c)        In the event a Sale Transaction occurs prior to the Earn-Out Determination Date, the Earn-Out Payment shall equal the greater of: (i) the amount determined based on the formula set forth in subsection (a) of thisSection 2.07 (taking into account the Earn-Out Minimum and the Earn-Out Maximum and utilizing the closing date of the Sale Transaction as the Earn-Out Determination Date);and (ii) twenty onepoint six percent (21.6%) of the total consideration paid or received or to be paid or received in connection with the Sale Transaction, which may not exceed the Earn-Out Maximum.

(d)        Within ninety (90) days after the Earn-Out Determination Date (or the closing of a Sale Transaction pursuant to subsection (b) of this Section 2.07), Purchaser shall

calculate the Earn-Out Payment and deliver to JUSA a statement (the "Earn-Out Statement") setting forth such calculation with reasonable supporting documentation. The Earn-Out Statement shall be certified as true and correct by the Chief Financial Officer of the Company and the Purchaser. Within thirty (30) days after JUSA's receipt of the Earn-Out Statement, JUSA shall submit to Purchaser either (i) a notice either indicating that JUSA accepts the Earn-Out Statement, in which case the Earn-Out Statement shall be deemed accepted by JUSA and shall be conclusive for purposes of determining the Earn-Out Amount, or (ii) a notice that JUSA does not accept the Earn-Out Statement,(the "Earn-Out Objection Notice"), which such notice shall be accompanied by a detailed statementspecifying JUSA's objections to the Earn-Out Statement. At all reasonable times during the thirty (30) days immediately following JUSA's receipt of the Earn-Out Statement, JUSA and its representatives shall be permitted to review the records, work papers, schedules and other documents of the Purchaser and the Company relating to the Earn-Out Statement reasonably requested by JUSA, and the Purchaser shall make reasonably available, on a timely basis, to JUSA and its representatives the individuals responsible for the preparation of the Earn-Out Statement in order to respond to the inquiries of JUSA related thereto.

(e)     If JUSA delivers a timely Earn-Out Objection Notice, the Parties shall use good faith efforts to resolve the matters in dispute, but if JUSA and the Purchaser fail to reach a final resolution within thirty (30) days after Purchaser's receipt of the Earn-Out Objection Notice, then JUSA and the Purchaser shall promptly engage the Neutral Accountant, acting as an expert and not an arbiter, to resolve the items remaining in dispute (the "Disputed Items"). Purchaser and JUSA agree to execute such customary documents, agreements and arrangements as are reasonably requested by the Neutral Accountant in connection with such engagement. Within ten (10) days following the engagement of the Neutral Accountant, each of JUSA and Purchaser shall submit to the Neutral Accountant its respective position with regard to the Disputed Items.  The Neutral Accountant shall be instructed to use all reasonable efforts to resolve all the Disputed Items within twenty (20) days following its receipt of the respective positions of JUSA and Purchaser.  The determination by the Neutral Accountant shall take into account this Agreement and shall be conclusive and binding on each of JUSA and Purchaser, absent manifest error. In connection with the Neutral Accountant's determinations hereunder, (i) the scope of the Neutral Accountant's review shall be limited to only the Disputed Items, (ii) the Neutral Accountant shall not assign a value to any Disputed Item greater than the greatest value for such Disputed Item claimed by JUSA or Purchaser or less than the lowest value for such Disputed Item claimed by JUSA or Purchaser, in each case as presented to the Neutral Accountant and (iii) the Neutral Accountant shall conduct its determination activities in a manner wherein all materials submitted to it are held in confidence and shall not be disclosed to third parties.

(f)     After the Neutral Accountant has resolved the Disputed Items, Purchaser and JUSA shall be deemed to have accepted as final a revised Earn-Out Statement, which shall be prepared by the Neutral Accountant and which shall reflect (i) the Disputed Items, if any, resolved by agreement of JUSA and Purchaser and (ii) the Disputed Items resolved by the Neutral Accountant, setting forth the basis for its resolution of each of the Disputed Items.  The Parties agree that judgment may be entered upon the determination of the Neutral Accountant in any court having jurisdiction over the Party or Parties against which such determination is to be

enforced. Within five (5) days after the determination of the final Earn-Out Statement, Purchaser shall pay to JUSAthe Earn-Out Payment.

(g)     The Earn-Out Payment shall be paid to JUSA by wire transfer of immediately available funds to the applicable Purchase Price Bank Account, subject to offsets and adjustments in respect of any amounts owing under Section 2.06 or Articles VI or VII hereof that are due but have not been paid.

(h)     Each of the Parties shall bear its own fees and expenses (including the fees and expenses of its own lawyers, accountants, appraisers and other advisers) in connection the determination of the Earn-Out Statement and all fees and expenses of the Neutral Accountant shall be allocated one-half to Purchaser and one-half to JUSA; provided, however, notwithstanding the foregoing, if the Neutral Accountantdetermines that an error by more than three percent (3%), the party that committed the error shall pay the fees and expenses of the other party's lawyers, accountants, appraisers and other advisers engaged in connection the determination of the Earn-Out Statement and all fees and expenses of the Neutral Accountant.

(i)     In order to further secure the payment of the Earn-Out Amount as described herein, which amount is acknowledged by the Parties to constitute a deferred payment of a portion of the Purchase Price, (i) the Purchaser hereby guarantees payment of the Earn-Out Amount determined in accordance with this <u>Section 2.07</u>,and (ii) the Guarantee provided in accordance with Section 2.04 hereto shall include a guarantee of payment of the Earn-Out Amount by Zaimella del Ecuador, S.A.

(j)     From and after the Closing Date through the Earn-Out Determination Date, Purchaser shall undertake its best efforts to maximize the Company's EBITDA and consequently the amount of the Earn-Out Payment, and neither the Purchaser nor any of its Affiliates will, directly or indirectly, take any actions which could reasonably circumvent or artificially minimize the amount of the Earn-Out Payment, including, by way of example and not as a limitation, entering into unreasonable payment obligations or expenses which exceed the prevailing market rate of such obligations or expenses,unless previously approved by JUSA.

(k)     For the avoidance of doubt, Larach shall have no interest in the Earn-Out Payment and no right to contest or otherwise have input into the amount of the Earn-Out Payment.  Any determination of the amount of the Earn-Out Payment in accordance with the provisions hereof, or any agreement between Purchaser and JUSA as to the amount, calculation, payment or other issue in respect of the Earn-Out Payment shall be conclusive and binding on the parties (including Larach).

<div align="center">

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES OF THE SELLERS**

</div>

Each Seller and Pando, severally, but not jointly, hereby represents and warrants to the Purchaser, as applicable, subject to such exceptions as may be disclosed in the Disclosure Schedule, as follows:

SECTION 3.01          <u>Organization, Authority and Qualification of the Sellers</u>.

(a)      JUSA is duly organized and licensed, validly existing and in good standing (or having comparable active status) under the Laws of the jurisdiction of its formation and has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby and thereby.  The execution and delivery by JUSA of this Agreement, the performance by JUSA of its obligations hereunder and the consummation by JUSA of the transactions contemplated hereby have been duly authorized by all requisite action on the part of JUSA.  This Agreement has been duly executed and delivered by JUSA, and (assuming due authorization, execution and delivery by the other Parties) this Agreement constitutes the legal, valid and binding obligations of JUSA, enforceable against JUSA in accordance with its terms.

(b)      Larach is a natural person has the requisite legal capacity to enter into this Agreement, to carry out his obligations hereunder and to consummate the transactions contemplated hereby.  This Agreement has been duly executed and delivered by him, and (assuming due authorization, execution and delivery by the other Parties) constitutes the legal, valid and binding obligations of him, enforceable against him in accordance with its terms.

(c)      Pando is a natural person has the requisite legal capacity to enter into this Agreement, to carry out his obligations hereunder and to consummate the transactions contemplated hereby.  This Agreement has been duly executed and delivered by him, and (assuming due authorization, execution and delivery by the other Parties) constitutes the legal, valid and binding obligations of him, enforceable against him in accordance with its terms.

SECTION 3.02      No Conflict.  Except as may result from any facts or circumstances relating solely to the Purchaser, the execution, delivery and performance of this Agreement by such Seller does not and will not (a) violate, conflict with or result in the breach of, if such Seller is not a natural person, its articles of organization or limited liability company agreement, (b) conflict in any material respect with or violate in any material respect any Law or Governmental Order applicable to such Seller, or (c) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which such Seller is a party.

SECTION 3.03      Shares.  The Shares set forth opposite such Seller's name on Annex I are owned of record and beneficially, directly or indirectly, free and clear of all Encumbrances.   There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments created by such Seller relating to such Shares.

SECTION 3.04      Organization, Authority and Qualification.  The Company is duly organized and validly existing under the Laws of the State of Florida.  The Company has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted in all material respects.

SECTION 3.05      Capitalization.  Annex I sets forth, with respect to the Company, the issued and outstanding Shares and the ownership of such Shares as of the date of this Agreement and immediately prior to the Closing Date.  All of the Shares (i) have been duly

authorized and validly issued and are fully paid and non-assessable and (ii) were not issued in violation of any right of first refusal, purchase option, call option, subscription right, preemptive right or any similar right or restriction. There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments relating to the Shares or obligating the Company to issue or sell any shares of capital stock of, or any other equity interest in the Company. The Shares set forth on <u>Annex I</u> constitute all of the issued and outstanding Shares. The Company has no Subsidiaries.

SECTION 3.06     <u>No Conflict</u>.   Except as may result from any facts or circumstances relating solely to the Purchaser, the execution, delivery and performance of this Agreement by the Company does not and will not (a) violate, conflict with or result in the breach of any provision of the certificate of incorporation or bylaws (or similar organizational documents) of the Company, (b) conflict with or violate any Law or Governmental Order applicable to the Company or (c) conflict with, result in any breach of, constitute adefault (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, acceleration or cancellation of, any Material Contract.

SECTION 3.07     <u>Governmental Consents and Approvals</u>.   The execution, delivery and performance of this Agreement by the Company does not and will not require any consent, approval, authorization or other order or declaration of, action by, filing with, notification to or permit from, any Governmental Authority, other than those listed in Section 3.02 of the Disclosure Schedule, except as may be necessary as a result of any facts or circumstances relating solely to the Purchaser or any of its Affiliates.

SECTION 3.08     <u>Financial Information</u>.   (i) The Financial Statements have been prepared on the basis of the books and records of the Company, (ii) the Financial Statements, taken as a whole, fairly present the financial condition of the Company in all material respects as of the respective dates and for the periods indicated, and (iii) the Audited Financial Statements have been prepared in accordance with GAAP. Section 3.08 of the Disclosure Schedule contains (i) the Interim Balance Sheet and the related statements of income and retained earnings for the nine (9)-month period then ended September 30, 2013 (the "<u>Unaudited Financial Statements</u>"), and (ii) the audited balance sheet of the Company as of December 31, 2012 and the related statements of income and retained earnings for the fiscal years then ended (such audited financial statements, the "<u>Audited Financial Statements</u>", and together with the Unaudited Financial Statements, the "<u>Financial Statements</u>"), together with the audit opinions of the Company's auditors with respect to the Audited Financial Statements.

SECTION 3.09     <u>Liabilities</u>. The Company has no liability of any nature, except (i) as disclosed, reflected or reserved against in the Financial Statements, (ii) for the Related Party Indebtedness, (iii) for Liabilities incurred inthe Ordinary Course of Business and consistent with past practices since September 30, 2013

SECTION 3.10     <u>Absence of Changes</u>.   There are no Liabilities of the Company of a nature required to be reflected on a balance sheet prepared in accordance with GAAP, other than Liabilities (a) reflected or reserved against on the Interim Balance Sheet, (b) incurred since the date of the Interim Balance Sheet in the Ordinary Course of Business;

SECTION 3.11   Conduct in the Ordinary Course.   Since the date of the Interim Balance Sheet to the Closing, there has not occurred any Material Adverse Effect.  As amplification of, in addition to, and notin limitation of the foregoing, during such period,except as set forth in Section 3.11 of the Disclosure Schedules, the Company has not:

(a)   declared, set aside or paid any dividends on or made any other distribution in respect of any of its capital stock, decreed or made any capital reductions, capital amortizations, or stock redemptions;

(b)   split, combined or reclassified any of its capital stock or issued or authorized or proposed the issuance of any securities in respect of, in lieu of, or in substitution for shares of its capital stock, or repurchased, redeemed or otherwise acquired any shares of its capital stock;

(c)   issued, delivered, pledged, encumbered, sold or transferred, or proposed the issuance, delivery, pledge, encumbrance, sale or transfer of, any shares of its capital stock or securities convertible into, or rights, warrants or options to acquire, any such shares of capital stock or other convertible securities or proposed any change in its equity capitalization;

(d)   sold, transferred, licensed, pledged, encumbered, mortgaged or otherwise disposed of tangible or intangible assets (other than Inventory in the Ordinary Course of Business consistent with past practices) with an aggregate fair market value in one transaction or a series of transactions in excess of $30,000;

(e)   acquired or agreed to acquire by merging or consolidating with, or by purchasing any material portion of the capital stock or assets of, or by any other manner, any business or any corporation, partnership, association or other business organization or division thereof;

(f)   made any aggregate capital expenditures or commitments for any capital expenditure materially in excess of $50,000;

(g)   made any loan to, guaranteed any indebtedness of, or otherwise incurred any Indebtedness on behalf of, or made any investment in, any Person;

(h)   failed to pay any creditor any material amount owed to such creditor within thirty (30) days of its due date;

(i)   granted any increase, or announced any increase, in the wages, salaries, compensation, bonuses, incentives, pension or other benefits payable by the Company to any of its employees, officers and Directors, including any increase or change pursuant to any Employee Benefit Plan or (ii) established or increased or promised to increase any benefits under any Employee Benefit Plan, in either case except (A) as required by Law or any collective bargaining agreement and/or (B) involving increases in wages or salaries for employees consistent with past practices of the Company;

(j)       entered into any agreement, arrangement or transaction with any of its directors, officers, employees or stockholders (or with any relative, beneficiary, spouse or Affiliate of such Persons), including any change of control or severance agreement;

(k)       made any contribution to any Employee Benefit Plan or change in the manner of any contribution made to any Employee Benefit Plan, other than for required contributions in accordance with the terms of such Employee Benefit Plan;

(l)       adopted or amended any Employee Benefit Plan;

(m)       disclosed any secret or confidential intellectual property (except by way of issuance of a patent) or permitted to lapse or become abandoned any intellectual property (or any registration or grant thereof or any application relating thereto) to which, or under which, the Company has any right, title, interest or license;

(n)       written down or written up (or failed to write down or write up in accordance with GAAP) the value of any Inventories or Receivables or revalued any of the assets other than consistent with past practices and in accordance with GAAP;

(o)       made any material change in the customary methods of operations of the Company, including practices and policies relating to purchasing, Inventories, collections of Receivables, marketing, selling and pricing, other than changes made in the Ordinary Course of Business consistent with past practices;

(p)       made any change in any method of accounting or accounting practice or policy used by the Company, other than such changes required by GAAP;

(q)       made or changed any express or deemed election or settled or compromised any Liability with respect to Taxes of the Company;

(r)       entered into a contract with or transferred assets or legal rights to any of the Sellers, any Affiliate of any Seller or any officer, director or Affiliate of the Company or any family member of any of the foregoing Persons (except for payments of salary and benefits and reimbursement of business expenses in the Ordinary Course of Business); or

(s)       agreed or otherwise committed to take any of the foregoing actions.

SECTION 3.12       Litigation.  As of the date of this Agreement, there is no Action by or against the Company pending or, to the Company's Knowledge, threatened before any Governmental Authority that would have a Material Adverse Effect or would affect the legality, validity or enforceability of this Agreement or the consummation of the transactions contemplated hereby or thereby.

SECTION 3.13       Compliance with Laws.

(a)       The Company has conducted and continues to conduct its business in all material respects in accordance with all Laws and Governmental Orders to which they are

subject and the Company is not in violation in any material respect of any such Law or Governmental Order.

(b)     The Company is in possession of all licenses, permits, authorizations and approvals issued by any Governmental Authority (each, a "Permit") which are necessary for it to conduct the Subject Business as now or as previously conducted or for the ownership and use of its assets.  The Company is not in default of any such Permit.  None of such Permits will be materially and adversely affected by the consummation of the transactions contemplated hereby.

SECTION 3.14        Intellectual Property.

(a)     Section 3.14 of the Disclosure Schedule sets forth a true and complete list, as of the Closing, of all Registered Company Intellectual Property.   True and correct copies of all national and international Registered Company Intellectual Property certificates are attached as Exhibit D hereto.

(b)     The use of the Company Intellectual Property by the Company as currently conducted does not infringe any valid, enforceable and unexpired Intellectual Property of any other Person and, as of the date of this Agreement and up to the Date Closing, there is no Action initiated by any other Person pending threatened against the Company concerning the foregoing.

(c)     With respect to each item of Registered Company Intellectual Property, the Company is the owner of the entire right, title and interest in and to each item of such Registered Company Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances), and to the Company's Knowledge, no Person is engaging in any activity that infringes any Company Intellectual Property in any manner that would reasonably be expected to infringe on Intellectual Property of others.

(d)     All Intellectual Property related to the business of the Company are held by the Company and not by any Shareholder, directly or indirectly.

(e)     Other than the Registered Company Intellectual Property, no Seller or relative of a Seller owns, directly or indirectly, anywhere in the world, Intellectual Property that is related to the business of the Company.

SECTION 3.15        Software Licenses.   The Company is current with any and all required product licenses with respect to any software, cloud systems, url's, and other technological points utilized by the Company in its operation.

MIADOCS 8389889 8

SECTION 3.16       Real Property.

(a)       Sections 3.16(a) and 3.16(b) of the Disclosure Schedule lists each parcel of real property owned by the Company (the "Owned Real Property").   The Company has good and marketable title in fee simple to each parcel of Owned Real Property, free and clear of all Encumbrances, except Permitted Encumbrances listed in Section 3.16(a)(ii) of the Disclosure Schedules.

(b)       Section 3.16(b) of the Disclosure Schedule lists, as of the Closing, the street address of each parcel of real property leased from a third party by the Company (the "Leased Real Property") pursuant to a lease, sublease or other similar agreement ("Company Real Property Leases").   The Company has made available to the Purchaser true and complete copies of the Company Real Property Leases.   There are no limitations, other than as set forth in the subject Company Real Property Leases and other than as are applicable generally to lessees of similar properties (e.g., zoning laws, nuisance ordinances, etc.), to the Company's access or use of the Leased Real Property.

(c)       The interests of the Company in the Owned Real Property and the Leased Real Property to be transferred pursuant to this Agreement are sufficient for the continued conduct of the Company's business after the Closing in substantially the same manner as conducted prior to the Closing.

(d)       The Company Real Property Leases are valid and binding on the Company and, to the Knowledge of the Company, the counterparties thereto, and is in full force and effect and (ii) the Company is not in breach of any obligation under any Company Real Property Leases and, to the Knowledge of the Company, the counterparties thereto are not in breach of any material provision thereof.

SECTION 3.17       Employee Benefit Matters.

(a)       There are no Employee Benefit Agreements in place.   Moreover, except as provided in applicable Laws, the Company has no commitment (A) to create, incur liability with respect to or cause to exist, any other employee benefit plan, program or arrangement, (B) to enter into any Contract or agreement to provide compensation or benefits to any individual, or (C) to modify, change or terminate any Employee Benefit Plan, other than with respect to a modification, change or termination required by applicable Law.

SECTION 3.18       Labor Matters.To the Knowledge of the Company, there are no collective bargaining or similar agreement to which the Company is a party and is applicable to Persons employed by the Company ("Labor Agreements").   Further, there are no organizational campaigns, petitions or other unionization activities seeking recognition of a collective bargaining unit which could affect the Company.   There are no material controversies, strikes, slowdowns or work stoppages pending or, to the Knowledge of the Company, threatened between the Company and any of its employees, and the Company has not experienced any such material controversy, strike, slowdown or work stoppage within the past three (3) years.   The Company is currently in compliance in all material respects with all applicable Laws relating to

the employment of labor, including those related to wages, hours, collective bargaining, consultation notifications and the payment and withholding of Taxes.

SECTION 3.19        Taxes.

(a)        The Company has filed all Tax Returns required to be filed by it.

(b)        As of the time of filing, such Tax Returns were true and correct in all material respects and the Company has paid all Taxes shown as due on such Tax Returns.

(c)        The Company has not waived any statute of limitations affecting any Tax Liability or agreed to any extension of time during which a Tax assessment or deficiency assessment may be made, which waiver or extension is still in effect.

(d)        There are no pending Tax audits of any Tax Returns of the Company and the Company has not received any written statements of deficiencies or proposed deficiencies (or similar notices) by any taxing authority, including, without limitation, county, city, state, and/or federal taxing authorities.

(e)        The Company does not have any outstanding debts with any taxing authority, including, without limitation, county, city, state, and/or federal taxing authorities.

SECTION 3.20        Material Contracts.

(a)        Section 3.20(a) of the Disclosure Schedule lists each of the following Contracts to which the Company is a party in effect as of the Closing (such Contracts being "Material Contracts"):

(i)        any Contract or group of Contracts with the same or affiliated counterparties that provide(s) for the payment or receipt by the Company of money, services or property with an aggregate annual value in excess of $50,000;

(ii)        any Contract or group of Contracts with the same or affiliated counterparties under which the Company created, incurred, assumed or guaranteed any Indebtedness in excess of $50,000 or under which there has been imposed a security interest on any of the assets, tangible or intangible, of the Company;

(iii)        any Contract entered into in the past three (3) years for the disposition of any significant portion of the assets or business of the Company (other than sales of products in the Ordinary Course of Business) or any agreement entered into in the past three (3) years for the acquisition of the assets or business of any other Person (other than purchases of products in the Ordinary Course of Business), in each case involving consideration in excess of $100,000;

(iv)        any Contract that limits or purports to limit in any respect the ability of the Company to compete in any line of business or with any Person or in any geographic area or during any period of time;

> (v)     the Company Real Property Leases;
>
> (vi)    all Affiliate Contracts; and
>
> (vii)   all Company IP Agreements.

(b)     (i)  Each Material Contract is valid and binding on the Company and, to the Knowledge of the Company, the counterparties thereto, and is in full force and effect and (ii) the Company is not in material breach of any material obligation under any Material Contract and, to the Knowledge of the Company, the counterparties thereto are not in breach of any material provision thereof.

SECTION 3.21      Environmental Matters.

(a)     The Company is in compliance with all applicable Environmental Laws and all applicable Environmental Permits;

(b)     There are no Environmental Claims pending or, to the Company and Seller's Knowledge, threatened against the Company;

(c)     The Company is not conducting or funding any Remedial Action;

(d)     The Company is not required by any Governmental Authority to undertake any Remedial Action

SECTION 3.22      Insurance.   The Company has made available to the Purchaser true, correct and complete copies of each material insurance policy and bond issued by a third party commercial insurer and covering the Company or its assets or properties or the Company Employees.  Such policies and bonds are in full force and effect, all premiums due and payable thereon have been paid, and the Company has not received notice from any insurer or agent of any intent to cancel any such insurance policy or bond or engaged in any action or inaction that would subject the Company to such cancellation or notice of intent to cancel.  The Company has complied in all material respects with the terms and provisions of such policies and bonds.  There is no material claim by the Company pending under any of such policies or bonds as to which coverage has been denied or disputed by the underwriters of such policies or bonds.

SECTION 3.23      Transactions with Affiliates.   None of the Sellers, any Affiliate of any Seller or any officer, director or Affiliate of any of the Company and any family member of any of the foregoing Persons is a party to or an express beneficiary of any contract with the Company or has any interest in any personal, real, or intellectual property used by the Company (an "Affiliate Contract").  There are no pending accounts receivable or payable with Affiliates or any other liabilities owed by the Company to any Affiliates (except for the interest referenced in Section 1.01(b)(i)(B) of the Disclosure Schedules).

SECTION 3.24      No Brokers.   No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from the Company in connection

with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Company.

SECTION 3.25    Suppliers.  Section 3.25 of the Disclosure Schedule lists the names and addresses of each of the ten most significant suppliers of raw materials, supplies, merchandise and other goods for the Subject Business during the nine (9)-month period ended September 30, 2013 and the amount for which each supplier invoiced the Company during such period.  To the Knowledge of the Company, the Company has not received any notice that any material supplier will not sell raw materials, supplies, merchandise and other goods to the Company at any time after the Closing on terms and conditions substantially similar to those used in its current sales to the Subject Business, subject only to general or customary price increases.

SECTION 3.26    Customers.  Section 3.26 of the Disclosure Schedule lists the names and addresses of each of the twenty most significant customers (by revenue) of the Subject Business for the nine (9) month period ended September 30, 2013 and the amount of which each such customer was invoiced during such period.  The Company has not received any notice or has any reason to believe that any significant customer of the Subject Business, has ceased, or will cease, to use the products, equipment, goods or services of the Company, or has substantially reduced, or will substantially reduce, the use of such products, equipment, goods or services.

SECTION 3.27    Disposition of Assets.  Since July 31, 2013, the Company has not sold, transferred, licensed, pledged, encumbered, mortgaged or otherwise disposed of tangible or intangible assets (other than Inventory against payment for the same in the Ordinary Course of Business consistent with past practices) with an aggregate fair market value in one transaction or a series of transactions in excess of $50,000.

SECTION 3.28    No Further Representations and Warranties.  The representations and warranties expressly set forth in this Agreement are the only representations and warranties made by Sellers and Pando in connection with the transactions herein contemplated.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby represents and warrants to the Sellers as follows:

SECTION 4.01    Organization and Authority of the Purchaser.  The Purchaser is duly organized, validly existing and in good standing under the Laws of the jurisdiction where it was organized and has all necessary power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby.  The Purchaser is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing would not materially and adversely affect the ability

of the Purchaser to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement.   The execution and delivery by the Purchaser of this Agreement, the performance by the Purchaser of its obligations hereunder and the consummation by the Purchaser of the transactions contemplated hereby have been duly authorized by all requisite action on the part of the Purchaser. This Agreement has beenduly executed and delivered by the Purchaser, and (assuming due authorization, execution and delivery by the other Parties) this Agreement constitutes, the legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with its terms.

SECTION 4.02       No Conflict.   Assuming that all consents, approvals, authorizations and other actions described in <u>Section 4.03</u> have been obtained and except as may result from any facts or circumstances relating solely to the Purchaser, the execution, delivery and performance by the Purchaser of this Agreement does not and will not (a) violate, conflict with or result in the breach of any provision of the certificate of incorporation or bylaws (or similar organizational documents) of the Purchaser, (b) conflict in any material respect with or violate in any material respect any material Law or material Governmental Order applicable to the Purchaser or its respective assets, properties or businesses or (c) conflict in any material respect with, result in any material breach of, constitute a material default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which the Purchaser is a party.

SECTION 4.03       Governmental Consents and Approvals.   The execution, delivery and performance by the Purchaser of this Agreement does not and will not require any consent, approval, authorization or other order of, action by, filing with, or notification to, any Governmental Authority,except where failure to obtain such consent, approval, authorization or action, or to make such filing or notification, would not prevent or materially delay the consummation by the Purchaser of the transactions contemplated by this Agreement.

SECTION 4.04       Financing.  The Purchaser and its affiliates have sufficient cash, available lines of credit or other sources of immediately available funds to enable it to pay, in cash, the Purchase Price, including without limitation the Earn-Out Payment, and all other amounts payable pursuant to this Agreement or otherwise necessary to consummate all the transactions contemplated hereby.

SECTION 4.05       Litigation.   No Action by or against the Purchaser is pending or, to the knowledge of the Purchaser, threatened, which could affect the legality, validity or enforceability of this Agreement or the consummation of the transactions contemplated hereby.

SECTION 4.06       No Brokers.   No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement in respect of which the Company or any Seller could have any liability.

SECTION 4.07    No Further Representations and Warranties.  The representations and warranties expressly set forth in this Agreement are the only representations and warranties made by the Purchaser in connection with the transactions herein contemplated.

## ARTICLE V
## ADDITIONAL AGREEMENTS

SECTION 5.01    Access to Information.    In order to facilitate the resolution of any claims made against or incurred by any of the Sellers, the Company with respect to the transactions contemplated by this Agreement and for purposes of compliance with securities, environmental, employment and other Laws, until the later of the seventh (7th) anniversary of the Closing or the expiration of the relevant period for the statutes of limitations (including any extensions thereof), the Purchaser shall (i) retain the books and records relating to the Company for periods prior to the Closing, and (ii) upon reasonable notice, afford the officers, employees, agents, trustees and representatives of the Sellers reasonable access (including the right to makecopies), during normal business hours, to such books and records.

SECTION 5.02    Further Action.

(a)    The Parties shall use their reasonable best efforts to take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated by this Agreement.

(b)    From time to time after the Closing, without additional consideration, each Party will (or, if appropriate, will cause its Affiliates to) execute and deliver such further instruments and take such other action as may be necessary or reasonably requested by another Party to make effective the transactions contemplated by this Agreement.  Without limiting the foregoing, upon reasonable request of the Purchaser, each Seller shall and shall cause its Affiliates to, execute, acknowledge and deliver all such further assurances, deeds, assignments, consequences, powers of attorney and other instruments and papers as may be required to sell, transfer, assign, convey and deliver to the Purchaser all right, title and interest in and to the Shares.

SECTION 5.03    Transitional Period Obligations.During the period of ninety (90) days following the Closing (the "Transitional Period"), Larach and Irela Larach shall facilitate and cooperate such that an adequate organizational, directive, economic, and functional transition take place, with respect to customers, suppliers, employees, and business operations. Specifically, Larachand Irela Larach undertake to perform the following actions:(i) devotesubstantially all of his or her working time to assisting in the transition, (ii) attend such meetings with suppliers, customers, employees, and other business partners of the company as Purchaser may reasonably request, (iii) send, or participate in sending, any communications to such parties as Purchaser may reasonably request, (iv) provide Purchaser with all business records of the Company in his or her possession or control, including but not limited to employee files and records, pending sales, upcoming opportunities,lists of suppliers, customers, key personnel, account statements, open orders, invoices, and prospective suppliers or customers, (v)

spend such time as Purchaser may reasonably request meeting with Company and Purchaser employees and representatives and helping to orient them in the Company, introduce them to relevant parties, and assist them in assuming control of the company, (vi) refrain from disparaging the Company, Purchaser, or anyone associated with either the Company or the Purchaser to customers, suppliers, employees, and other business partners of the company, (vii) comply in all respects with the that certain Shareholder Non-Compete and Confidentiality Agreement that is attached as ExhibitA hereto, (viii) refrain from taking any other steps to actively inhibit or disrupt the transition or negatively impair the Company, the Purchaser, its employees, shareholders, suppliers, customers, or other business partners,(ix) undertake all necessary measures with the objective of providing for normalcy in the Company's business activities and maintain in place all established production control and reporting mechanisms and (x) act in good faith with respect to the Company's business activities.  In the event Larach or Irela Larach fails to comply with or is in breach of items (i), (ii), (iii), (iv), (v), (ix) or (x) of this Section 5.03 (the "Curable Violations"), Purchaser shall provide Larach with written notice of such breach and Larach (and Irela Larach, as applicable) shall have ten (10) days from the date of such notice to remedy the alleged breach.  The parties acknowledge that there will not be an opportunity to cure breaches of provisions (vi), (vii), or (viii) of this Section 5.03(the "Non-Curable Obligations").  In the event Larach (or, as applicable, Irela Larach) fails to cure any Curable Violation(s) for which notice was provided or in the event Larach (or, as applicable, Irela Larach) violates any of the Non-Curable Violations, the Transitional Compliance Payment shall not be due and shall be irrevocably forfeited by Larach.  Any dispute with regards to compliance or non-compliance with this Section 5.03 shall be handled in accordance with the terms of the Transitional Compliance Payment Escrow Agreement.  During the Transitional Period, Larach and Irela Larach will be paid the salary and will receive the benefits that were applicable to them as of September 30, 2013.

SECTION 5.04        Release of Guarantees.

(a)        Following the Closing, Purchaser shall promptly, and in any event within ninety (90) days following the Closing, obtain the release of thecollateral security or guarantees given by either of the Sellers or, in the case of JUSA, any of its members, managers, officers and Affiliates, as apledge or guaranty of the Company's obligations, as such collateral security and guarantees are specified Schedule 5.04 of the of the Disclosure Schedule. Any such release shall be in writing, unconditional and otherwise acceptable to the Seller or other party being released. Without limiting the foregoing obligations, the Company shall not incur any additional debt obligations to the extent the same remain guaranteed or secured by any of the Sellers or, in the case of JUSA, any of its members, managers, officers and Affiliates.  Moreover, the Purchaser shall indemnify and hold harmless each of the Sellers and Pando and, in the case of JUSA, each of its members, managers, officers, and Affiliates, against any direct liability or loss any of them may incur and/or any claim made against them following the Closing in respect of any pledge or guaranty referenced in this Section 5.04(a), and Purchaser's obligations under this Section 5.04 shall be guaranteed by Zaimella del Ecuador, S.A.

(b)        Following the Closing, and subject to Section 2.07(i), Purchaser shall promptly, and in any event within ninety (90) days following the Closing, provide or make arrangements for the provision of a line of credit to the Company to replace the line of credit provided to the Company as of the Closing by New Continent Finance, Inc.

SECTION 5.05        Non-Competition and Confidentiality.  Sellers shall each execute the Shareholder Non-Complete and Confidentiality Agreement attached as Exhibit A hereto and comply with the terms thereof.

## ARTICLE VI
## TAX MATTERS

SECTION 6.01        Tax Indemnities.  From and after the Closing, the Sellers agree to indemnify the Purchaser against all Excluded Taxes, to the extent that such Taxes are in excess of the amount reserved for Taxes (other than deferred taxes that are not indemnified hereunder), if any,in the calculation of the Adjusted Closing Amount, but limited to the extent set forth in Sections 6.08, 7.05 and 7.07.  The Purchaser shall be responsible for and shall indemnify and hold the Sellers and their Affiliates harmless against all Taxes and associated expenses not allocated to the Sellers pursuant to this Section 6.01.

SECTION 6.02        Tax Refunds and Tax Benefits.  Except as expressly provided in this Section 6.02, any Tax refund, credit or similar benefit (including any interest paid or credited with respect thereto) relating to any taxable period or portion thereof prior to the Closing Date in excess of its accounting balance in the Interim Balance Sheet shall be the property of the Sellers, and if received by the Purchaser or the Company, shall be paid over promptly to the Sellers allocated in accordance with the Seller Percentages.  The Purchaser shall, if the Sellers so request and at the Sellers' expense, cause the Company or other relevant entity to file for and use its reasonable best efforts to obtain and expedite the receipt of any refund to which the Sellers would be entitled under this Section 6.02.  For purposes of determining the amount of Tax refund, credit or similar benefit that relates to a taxable period or portion thereof prior to the Closing Date, any payments in respect of Indebtedness, bonuses or other amounts (i) paid at the Closing by a Seller or the Company or (ii) not paid at the Closing and taken into account in the calculation of Final Closing Indebtedness shall be accrued and deducted on the Closing Date to the extent permitted by Law.  Notwithstanding the foregoing, any net operating lossesof the Companymay be carried forward or back to the extent permitted by Law to obtain a refund of (or credit on) Taxes, which shall inure solely to Purchaser's benefit upon receipt or realization.

SECTION 6.03        Preparation of Tax Returns.

(a)        The Sellers shall prepare and file (or cause the Company to prepare and file) all Tax Returns relating to the Company that are due (with applicable extensions) before the Closing Date.

(b)        The Purchaser shall prepare and file (or cause the Company to prepare and file) any Tax Returns relating to the Company due after the Closing Date, and Sellers shall cooperate with the Purchaser in doing so as reasonably requested from time to time by the Purchaser.  Such Tax Returns which are the responsibility of the Purchaser under this Section 6.03 shall be prepared in a manner consistent with the Company's past practice unless otherwise required by applicable Law (or to the extent that counsel for the Company or the Purchaser advises that there is no reasonable basis in Law therefor or determines that a Tax Return cannot be so prepared and filed without being subject to penalties).  The Purchaser shall deliver a draft

of the Company's 2013 Income Tax Returns to the Sellers, together with a statement showing the calculation and allocation of Taxes relating to a Straddle Period and supporting schedules and information, at least fourteen (14) days prior to filing for the Sellers' review and comment (with any revisions to be provided to the Purchaser as soon as reasonably practicable, but in no event later than seven (7) days prior to filing) and for the Sellers consent (which shall not be unreasonably withheld, delayed or conditioned) and shall make any changes to such Tax Returns as Sellers reasonably requests consistently with the above principles.

(c)       In the case of Taxes that are payable with respect to a Straddle Period, the portion of any such Tax that is allocable to the portion of the taxable period ending on the Closing Date shall be:

(i)       in the case of Taxes that are either (x) based upon or related to income or receipts or (y) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible) (other than conveyances pursuant to this Agreement, as provided under <u>Section 6.06</u>), deemed equal to the amount which would be payable (after giving effect to amounts which may be deducted from or offset against such Taxes) if the taxable period ended on the Closing Date; and

(ii)       in the case of Taxes imposed on a periodic basis with respect to the assets of the Company, or otherwise measured by the level of any item, deemed to be the amount of such Taxes for the entire Straddle Period (after giving effect to amounts which may be deducted from or offset against such Taxes) (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period), multiplied by a fraction the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period.  Any credit or refund resulting from an overpayment of Taxes for a Straddle Period shall be prorated based upon the method employed in this paragraph (c) taking into account the type of Tax to which the refund relates.  In the case of any Tax based upon or measured by capital (including net worth or long term debt) or intangibles, any amount thereof required to be allocated under this <u>Section 6.03(c)</u> shall be computed by reference to the level of such items on the day immediately preceding the Closing Date.  All determinations necessary to effect the foregoing allocations shall be made in a manner consistent with prior practice of the Company.

(d)       Payment by the indemnifying party of any amount due under <u>Section 6.01</u> shall be made within ten (10) days following written notice by the indemnified party that payment of such amounts to the appropriate taxing authority is due, <u>provided</u> that the parties shall comply with their notification obligations under <u>Section 6.05(a)</u> and <u>providedfurther</u> that the indemnifying party shall not be required to make any payment earlier than two (2) days before it is due to the appropriate taxing authority.  Notwithstanding anything to the contrary herein, if any Seller receives an assessment or other notice of Income Taxes due with respect to the Company for 2013 or otherwise in respect of Taxes for which the Sellers are not responsible, in whole or in part, then the Purchaser shall pay such Taxes, or if the Sellers pay such Taxes, then the Purchaser or the Company shall pay to the Sellers the amount of such Taxes for which

the Sellers are not responsible within five (5) days following such payment.  In the case of a Tax that is contested in accordance with the provisions of Section 6.05, payment of the Tax to the appropriate taxing authority will be considered to be due no earlier than the date a final determination to such effect is made by the appropriate taxing authority or court.

SECTION 6.04      Tax Cooperation and Exchange of Information.   The Sellers and the Purchaser shall provide each other with such cooperation and information as either of them reasonably may request of the other (and the Purchaser shall cause the Company to provide such cooperation and information) in filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes or participating in or conducting any audit or other proceeding in respect of Taxes.  Such cooperation and information shall include providing copies of relevant Tax Returns of the Company or portions thereof, together with related work papers and documents relating to rulings or other determinations by taxing authorities.  The Sellers, the Company and the Purchaser shall make themselves (and their respective employees) reasonably available on a mutually convenient basis to provide explanations of any documents or information provided under this Section 6.04.  Notwithstanding anything to the contrary in Section  6.03, each of the Sellers and the Purchaser shall retain all of its respective Tax Returns, work papers and all material records or other documents in its possession (or in the possession of its Affiliates) relating to Tax matters of the Company for any taxable period that includes the Closing Date and for all prior taxable periods until the later of (i) the expiration of the statute of limitations of the taxable periods to which such Tax Returns and other documents relate, without regard to extension or waivers thereof, or (ii) six (6) years following the due date (without extension) for such Tax Returns.  After such time, before the Sellers or the Purchaser shall dispose of any such documents in its possession (or in the possession of its Affiliates), the other Party shall be given an opportunity, after ninety (90) days' prior written notice, to remove and retain all or any part of such documents as such other Party may select (at such other Party's expense).  Any information obtained under this Section 6.04 shall be kept confidential, except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting an audit or other proceeding.

SECTION 6.05      Contests.

(a)      After the Closing, the Purchaser shall promptly notify the Sellers in writing of the proposed assessment or the commencement of any Tax audit or administrative or judicial proceeding or of any demand or claim on the Purchaser, their Affiliates or the Company which, if determined adversely to the taxpayer or after the lapse of time, could be grounds for indemnification by the Sellers under Section 6.01.  Such notice shall contain factual information (to the extent known to the Purchaser, their Affiliates or the Company) adequately describing the asserted Tax liability and shall include copies of any notice or other document received from any taxing authority in respect of any such asserted Tax liability.  If the Purchaser fails to give the Sellers prompt notice of an asserted Tax liability as required by this Section 6.05, then the Sellers shall not have any obligation to indemnify for any loss arising out of such asserted Tax liability, but only to the extent that failure to give such notice results in a detriment to the Sellers.

(b)      In the case of a Tax audit or administrative or judicial proceeding (a "Contest") that relates to Pre-Closing Periods, the Sellers shall have the obligation, at Sellers' expense, to cooperate with the Purchaser in responding to such Contest, as reasonably requested

by the Purchaser from time to time.  Sellers shall indemnify the Purchaser against any loss relating to such proceedings.

(c)     With respect to Straddle Periods, the Sellers may elect to direct and control, through counsel of its own choosing, any Contest involving any asserted Tax liability with respect to which indemnity may be sought from the Sellers pursuant to Section 6.01.  If the Sellers elect to direct a Contest, the Sellers shall within ninety (90) days of receipt of the notice of asserted Tax liability notify the Purchaser of its intent to do so, and the Purchaser shall cooperate and shall cause the Company to fully cooperate, at the Sellers' expense, in each phase of such Contest.  If the Sellers elect not to direct the Contest, the Purchaser or the Company may assume control of such Contest (at the Purchaser's expense).  However, in such case, none of the Purchaser or the Company may settle or compromise any asserted liability without prior written consent of the Sellers; provided, however, that consent to settlement or compromise shall not be unreasonably withheld.  In any event, the Sellers may participate, at Sellers' own expense, in the Contest.

(d)     The Purchaser and the Sellers agree to cooperate, and the Purchaser agrees to cause the Company to cooperate, in the defense against or compromise of any claim in any Contest.

SECTION 6.06     Conveyance Taxes.  The Purchaser shall be liable for, shall hold the Sellers harmless against, and agree to pay any and all Conveyance Taxes that may be imposed upon, or payable or collectible or incurred in connection with this Agreement and the transactions contemplated hereby, and the Purchaser shall promptly reimburse the Sellers for any such Conveyance Taxes which the Sellers are required to pay under applicable Law.  The Purchaser and the Sellers agree to cooperate in the execution and delivery of all instruments and certificates necessary to enable the Purchaser to comply with any filing requirements with respect to Conveyance Taxes.

SECTION 6.07     Tax Covenants.

(a)     Neither the Purchaser nor any of its Affiliates shall take, or after the Closing cause or permit the Company to take, any action or omit to take any action which could increase the Sellers' or any of their respective Affiliates' liability for Taxes.

(b)     Neither the Purchaser nor any of its Affiliates shall amend, refile or otherwise modify, or after the Closing cause or permit the Company to amend, refile or otherwise modify, any Tax election or Tax Return with respect to any taxable period (or portion of any taxable period) ending on or before the Closing Date without the prior written consent of the Sellers.  For the avoidance of doubt, neither the Purchaser nor any of its Affiliates shall carryback any tax attribute from any tax period after the Closing Date.

(c)     Neither the Purchaser nor any of its Affiliates shall make an election under section 338 of the Code with respect to the Company.

SECTION 6.08     Miscellaneous.

MIADOCS 8389889 8

(a)     For Tax purposes, the Parties agree to treat all payments made pursuant to any indemnification obligation under this Agreement as adjustments to the Purchase Price.

(b)     Any amount otherwise payable by the Sellers shall be reduced by any Tax benefit available to the Purchaser, its Affiliates or the Company arising in connection with any underlying adjustment resulting in the obligation of the Purchaser, its Affiliates, or the Company to pay Taxes or other amounts for which the Sellers are responsible under Section 6.01 or the accrual or payment of such Taxes.

(c)     This Article VIand the Tax-related representations contained in Article Vshall be the sole provision governing indemnities for Taxes under this Agreement; provided, however, that the indemnities provided in the first sentence of Section 6.01 shall be subject to the limitations of Section 7.05(b) (for which purpose Excluded Taxes in excess of the amount of such reserved for Taxes in the Adjusted Closing Amount Calculation shall be deemed to be "Losses") and Section 7.07.

## ARTICLE VII
## INDEMNIFICATION

SECTION 7.01     Survival of Representations, Warranties and Covenants. The representations and warranties of the Parties contained in this Agreement shall survive the Closing for a period of thirty-six (36) months after the Closing; provided, however, that any claim pertaining to liability for Taxes and any claim arising from fraud or willful misrepresentation on the part of any Seller or Pando shall survive the Closing for the applicable statute of limitation period; andprovidedfurther that any claim made with reasonable specificity by the party seeking to be indemnified within the time periods set forth in this Section 7.01 shall survive until such claim is finally and fully resolved.  All covenants and agreements contained in this Agreement shall survive the Closing for a period of thirty-six (36) months after the Closing, except for those covenants and agreements that by their terms are to be performed in whole or in part after the Closing, which shall remain in full force and effect for a period of thirty-six (36) months following the date by which such covenant or agreement is required to be performed; provided, however, that any claim made with reasonable specificity by the party seeking to be indemnified within the time periods set forth in this Section 7.01 shall survive until such claim is finally and fully resolved.

SECTION 7.02     Indemnification by the Sellers and Pando.  From and after the Closing, the Purchaser and its Affiliates and their respective officers, directors, employees, agents, successors and assigns (each a "Purchaser Indemnified Party") shall be indemnified and held harmless for and against all losses, damages, claims, costs and expenses, interest, awards, judgments and penalties (including reasonable attorneys' and consultants' fees and expenses) actually suffered or incurred by them (hereinafter a "Loss")by each Seller and Pando for Losses (i) arising out of or resulting from any breach of a representation or warranty made by such Seller in Article IIIof this Agreement; (b) arising out of disputes among the Sellers and/or Pando; or (c)  arising out of or resulting from any breach of any covenant or agreement of the Company contained in this Agreement or of any covenant or agreement of the Sellers not set forth in Article III.  In the event of any Loss entitling a Purchaser Indemnified Party to indemnification under this Article VII or under Article VI, and subject to the limitations on liability set forth

below in Section 7.05,the Sellers and Pando agreed amongst themselves that the amount in respect thereof shall be an obligation of both JUSA and Larach (and not of Pando), with JUSA and Larach being responsible, respectively, for seventy-two percent (72%) and twenty-eight percent (28%) of such obligation.  The foregoing sentence is intended to and shall create a legal obligation of each such party running in favor of the other and in favor of Pando that may be enforced by any lawful means.  Notwithstanding the foregoing, in the event either JUSA or Larach fails to satisfy its obligation hereunder, then the aggregate amount due hereunder shall be deemed, as to Purchaser, to be a joint and several obligation of JUSA, Larach, and Pando, and Purchaser shall be entitled to deduct such amount from or set such amount off against any further payment obligations of Purchaser arising under this Agreement, including but not limited to Purchaser's obligations in respect of the Transitional Compliance Payment and the Earn-Out Payment.

SECTION 7.03        Interest on Late Indemnification Payments.  In the event a claim for Indemnification is made under this Article VI, and the party responsible for paying such claim does not do so within thirty (30) days of demand for the payment by the party entitled to indemnification, and if the claim is ultimately adjudged or agreed to be valid, then the claim shall be paid by the responsible party(ies) along with interest from the date of the original appearance of the claim at a rate of eight percent (8%) per annum.

SECTION 7.04        Indemnification by the Purchaser.  From and after the Closing, the Purchaser shall indemnify and hold harmless each of the Sellers and their Affiliates and their respective officers, directors, employees, agents, successors and assigns (each a "Seller Indemnified Party") for and against any and all Losses, arising out of or resulting from:  (a) the breach of any representation or warranty made by the Purchaser contained in this Agreement or in any certificate delivered pursuant hereto; (b) the breach of any covenant or agreement by the Purchaser contained in this Agreement (including without limitation any failure of the Purchase to obtain the release of the Sellers from their guarantees and pledges pursuant to Section 5.04); or (c) any claim or cause of action by any Person arising before or after the Closing against any Seller Indemnified Party with respect to the operations of the Company, except for claims or causes of action with respect to which the Sellers are obligated to indemnify the Purchaser Indemnified Parties pursuant to Section 7.02 hereof.

SECTION 7.05        Limits on Indemnification

(a)        No Claim may be asserted nor may any Action be commenced against any Party for breach of any representation, warranty, covenant or agreement contained herein, unless written notice of such Claim or Action is received by such Party describing in reasonable detail (but only to the extent known at the time of such notice) the facts and circumstances with respect to the subject matter of such Claim or Action on or prior to the date on which the representation, warranty, covenant or agreement on which such Claim or Action is based ceases to survive as set forth in Section 6.01, irrespective of whether the subject matter of such Claim or Action shall have occurred before or after such date.

(b)        Notwithstanding anything to the contrary contained in this Agreement: (i) no Losses may be claimed under the first sentence of Section 6.01 or Section 7.02 by the Purchaser or shall be reimbursable by or shall be included in calculating the aggregate Losses set

forth in clause (ii) below other than Losses in excess of $20,000 resulting from any single claim or series of related claims; (ii) except to the extent arising from fraud or willful misrepresentation on the part of any Seller or Pando, the maximum amount of indemnifiable Losses which may be recovered from each of the Sellers under any provision hereof shall be an amount equal to the portion of the Purchase Price actually paid to such Seller hereunder, exclusive of applicable taxes; and (iii) except to the extent arising from fraud or willful misrepresentation on the part of any Seller or Pando, the maximum amount of indemnifiable Losses which may be recovered from Pando and JUSA in the aggregate shall be an amount equal to the portion of the Purchase Price actually paid to JUSA hereunder.

(c)     For all purposes of this Article VII, "Losses" shall be net of (i) any insurance or other recoveries payable to the Indemnified Party or any of its Affiliates in connection with the facts giving rise to the right of indemnification, (ii) any Tax benefit available to the Indemnified Party or any of its Affiliates arising in connection with the accrual, incurrence or payment of any such Losses (including the net present value of any Tax benefit arising in subsequent taxable years) and (iii) any amounts reserved on the Interim Balance Sheet with respect to such Loss.

(d)     Notwithstanding anything contained in this Agreement to the contrary, in the event that any fact, event or circumstance which results in an adjustment to the Purchase Price would also constitute a breach of any Indemnifying Party's representations, warranties, covenants or agreements under this Agreement or otherwise result in a Loss to the Indemnified Party, such Indemnifying Party shall have no obligation to indemnify the Indemnified Party with respect to such breach to the extent that (i) recovery for any such Loss would constitute a duplicative payment of amounts recovered as a Purchase Price adjustment.

SECTION 7.06     Notice of Loss; Third Party Claims.

(a)     An Indemnified Party shall give the Indemnifying Party notice of any matter which an Indemnified Party has determined has given or could give rise to a right of indemnification under this Agreement, within thirty (30) days of such determination, stating the amount of the Loss, if known, and method of computation thereof, and containing a reference to the provisions of this Agreement in respect of which such right of indemnification is claimed or arises.  Such notice shall include copies of all relevant notices or documents (including court papers) received by the Indemnified Party, so long as such disclosure would not reasonably be expected to have an adverse effect on attorney-client or other privileges available to the Indemnified Party.

(b)     If an Indemnified Party shall receive notice of any Action, audit, claim, demand or assessment (each, a "Third Party Claim") against it which may give rise to a claim for Loss under this Article IX, the Indemnified Party shall give the Indemnifying Party notice of such Third Party Claim within thirty (30) days of the receipt of such notice (or within such shorter period as may be required to permit the Indemnifying Party to respond to any such claim).  The Indemnifying Party shall be entitled to assume and control the defense of such Third Party Claim at its expense and through counsel of its choice if it gives notice of its intention to do so to the Indemnified Party within sixty (60) days of the receipt of such notice from the Indemnified Party.  If the Indemnifying Party elects to undertake any such defense against a

Third Party Claim, the Indemnified Party may participate in such defense at its own expense. The Indemnified Party shall cooperate with the Indemnifying Party in such defense and make available to the Indemnifying Party, at the Indemnifying Party's expense, all witnesses, pertinent records, materials and information in the Indemnified Party's possession or under the Indemnified Party's control relating thereto as is reasonably required by the Indemnifying Party. If the Indemnifying Party elects to direct the defense of any such claim or proceeding, the Indemnified Party shall not pay, or permit to be paid, any part of such Third Party Claim unless the Indemnifying Party consents in writing to such payment or unless the Indemnifying Party withdraws from the defense of such Third Party Claim or unless a final judgment from which no appeal may be taken by or on behalf of the Indemnifying Party is entered against the Indemnified Party for such Third Party Claim. If the Indemnified Party assumes the defense of any such claims or proceeding pursuant to this Section 7.06 and proposes to settle such claims or proceeding prior to a final judgment thereon or to forgo any appeal with respect thereto, then the Indemnified Party shall give the Indemnifying Party prompt written notice thereof and the Indemnifying Party shall have the right to participate in the settlement or assume or reassume the defense of such claims or proceeding. The Indemnified Party shall not settle any Third Party Claim without the Indemnifying Party's prior written consent, unless it waives any right to indemnification hereunder; any such settlement by the Indemnified Party without the Indemnifying Party's prior written consent shall constitute a full and unconditional release of the Indemnifying Party from all Liability in respect of such Third Party Claim. The Indemnifying Party shall have the right to settle any Third Party Claim for which it obtains a full release of the Indemnified Party in respect of such Third Party Claim or to which settlement the Indemnified Party consents in writing, such consent not to be unreasonably withheld or delayed.

SECTION 7.07     Remedies. The Purchaser and the Sellers acknowledge and agree that (i) following the Closing, the remedies expressly provided in this Article VII and in Article VI, along with the provisions of Article II and Article VIII and any other remedies expressly provided in this Agreement, shall be the sole and exclusive remedies of the Purchaser and the Sellers, as applicable, for any breach by the other Party of the representations and warranties in this Agreement or in any certificate delivered in connection herewith and for any failure by the other Party to perform and comply with any covenants and agreements in this Agreement, in each case except to the extent of any fraud or willful misrepresentation on the part of any Seller or Pando. Each Party shall take all reasonable steps to mitigate its Losses upon and after becoming aware of any event which could reasonably be expected to give rise to any Losses.

## ARTICLE VIII
## GENERAL PROVISIONS

SECTION 8.01     Expenses.     Except as otherwise specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be borne by the Party incurring such costs and expenses.

SECTION 8.02     Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, when delivery is

guaranteed by an internationally recognized overnight courier service, by facsimile (confirmed electronically or telephonically from the receiving facsimile machine) or within three (3) Business Days by registered or certified mail (postage prepaid, return receipt requested) to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this <u>Section 8.02</u>), if the delivery deadline date for any item under this Agreement is a day that is not a Business Day, the applicable delivery deadline date for such item shall be the immediately following Business Day:

(a)     if to the Company:

c/o Triangle Partners, Inc.
501 Brickell Key Drive, Suite 602
Miami, FL  33131
Facsimile: (305) 372-1089
Attention:  Luis Torrego

And via e-mail:  luis.torrego@triangle-partners.com

with a copy to:

Shutts & Bowen LLP
1500 Miami Center
201 South Biscayne Boulevard
Miami, FL  33131
Facsimile:  (305) 347-7810
Attn:  William G. McCullough, Esq.

And via e-mail:  wgm@shutts.com

(b)     if to E. Larach:

7701 SW 68th Terrace
Miami, FL  33143

with a copy to:

Greenberg Traurig, P.A.
401 East Las Olas Boulevard Suite 2000
Fort Lauderdale, FL  33301
Facsimile: (954) 759-5542
Attn:      Bruce March

(c)     if to JUSA:

c/o Triangle Partners, Inc.
501 Brickell Key Drive, Suite 602
Miami, FL  33131
Facsimile:     (305) 372-1089
Attention:     Luis Torrego

And via e-mail:  luis.torrego@triangle-partners.com

with a copy to:

Shutts & Bowen LLP
1500 Miami Center
201 South Biscayne Boulevard
Miami, FL  33131
Facsimile:  (305) 347-7810
Attn:  William G. McCullough, Esq.

And via e-mail:  wgm@shutts.com

(d)     if to the Purchaser:

Recalde Law Firm, P.A.
3250 NE 1st Avenue, Suite 303
Miami, FL  33137
Facsimile:     1- (305) 517-1408
Attention:     Rafael Recalde, Esq.

And via e-mail:  Rafael@recaldelaw.com

with a copy to:

Dr. Vladimir Naranjo
Calle Juan de Dios Morales
Lote #1 y Panamericana Sur
Sector La Balbina (Amaguaña)
Quito, Ecuador
Facismile:  5932-5932-3969500

And via e-mail:  vnaranjo@zaimella.com

and with a copy to:

Romero Arteta Ponce Abogados
12 de Octubre N. 2697 y Lincoln
Torre 1492 Piso 8, Codigo Postal 170516
Facsimile:  (593-2) 2986 664
Attention:      Diego Romero

And via e-mail:  dromero@law.com.ec

SECTION 8.03      Public Announcements.  None of the Parties shall make, or cause to be made, any press release or public announcement in respect of this Agreement or the transactions contemplated hereby or thereby or otherwise communicate with any news media without the prior written consent of the other Parties unless such press release or public announcement is required by Law or applicable stock exchange regulation, in which case the Parties shall, to the extent practicable, consult with each other as to the timing and contents of any such press release, public announcement or communication.

SECTION 8.04      Severability.   If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect for so long as the economic or legal substance of the transactions contemplated by this Agreement is not affected in any manner materially adverse to either Party.   Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated by this Agreement are consummated as originally contemplated to the greatest extent possible.

SECTION 8.05      Entire Agreement.  This Agreement and the documents to be delivered hereunder constitutes the entire agreement of the Parties with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, both written and oral, among the Parties with respect to the subject matter hereof and thereof.

SECTION 8.06      Assignment.   This Agreement may not be assigned by operation of Law or otherwise without the express written consent of the Sellers and the Purchaser (which consent may be granted or withheld in the sole discretion of any party), as the case may be, and any such purported assignment shall be void; provided however that Sellers' may assign or pledge their respective rights to receive Earn-Out Payment amounts under Section 2.07.

SECTION 8.07      Amendment.   This Agreement may not be amended or modified except (a) by an instrument in writing signed by each of the Sellers and the Purchaser that expressly references the Section(s) of this Agreement to be amended or (b) by a waiver in accordance with Section 8.08; provided, however, that either Seller may agree to a modification of any provision that affects only his or its own rights hereunder without participation by the other Seller, provided the modification does not diminish or otherwise alter any right or entitlement of such other Seller hereunder.

SECTION 8.08        Waiver.  (a)  The Purchaser may (i) waive any inaccuracies in the representations and warranties of the Sellers and the Company contained herein or in any document delivered by such Party pursuant hereto or (ii) waive compliance with any of the agreements of the Sellers and the Company or conditions to such Party's obligations contained herein; (b) the Sellers (acting jointly)may (i) waive any inaccuracies in the representations and warranties of the Purchaser contained herein or in any document delivered by the Purchaser pursuant hereto or (ii) waive compliance with any of the agreements of the Purchaser or conditions to the Purchaser's obligations contained herein; and (c) either Seller (acting singly) may waive compliance with any of the agreements of the Purchaser or conditions to the Purchaser's obligations hereunder, so long as such waiver pertains only to the rights of the waiving Seller and does not diminish or otherwise alter any right or entitlement of the other Seller hereunder.  Any such waiver shall be valid only if set forth in an instrument in writing signed by the Party to be bound thereby.  Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.  The failure of any Party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

SECTION 8.09        No Third Party Beneficiaries.  Except as provided for in Sections 8.02, 8.03 and 8.04, this Agreement shall be binding upon and inure solely to the benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Agreement.

SECTION 8.10        Specific Performance.  The Parties acknowledge and agree that the Parties would be irreparably damaged if any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached and that any non-performance or breach of this Agreement by any Party could not be adequately compensated by monetary damages alone and that the Parties would not have any adequate remedy at Law.  Accordingly, in addition to any other right or remedy to which the Parties may be entitled, at Law or in equity (including monetary damages), such Party shall be entitled to enforce any provision of this Agreement by a decree of specific performance and to temporary, preliminary and permanent injunctive relief to prevent breaches or threatened breaches of any of the provisions of this Agreement without posting any bond or other undertaking.  The Parties agree that each shall be entitled to enforce specifically the other parties' obligations to consummate the transactions contemplated by this Agreement (including without limitation the obligation to consummate the Closing and to pay the Purchase Price and the obligation to obtain the guarantee and pledged collateral releases pursuant to Section 5.04).

SECTION 8.11        Governing Law.  This Agreement shall be governed by, and construed in accordance with, the Laws of the State of Florida.  All Actions arising out of or relating to this Agreement shall be heard and determined exclusively in any federal court sitting in Miami-Dade County, Florida; provided, however, that if such federal court does not have jurisdiction over such Action, such Action shall be heard and determined exclusively in any Florida state court sitting in Miami-Dade County, Florida.  Consistent with the preceding sentence, the Parties hereby (a) submit to the exclusive jurisdiction of any federal or state court sitting inMiami-Dade County, Floridafor the purpose of any Action arising out of or relating to

this Agreement brought by either Party and (b) irrevocably waive, and agree not to assert by way of motion, defense, or otherwise, in any such Action, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the Action is brought in an inconvenient forum, that the venue of the Action is improper, or that this Agreement or the transactions contemplated by this Agreement may not be enforced in or by any of the above-named courts.  The parties hereby agree that the mailing of process or other papers in connection with any such Action or proceeding in the manner provided in Section 8.02, or in such other manner as may be permitted by Law, shall be valid and sufficient service thereof and hereby waive any objections to service accomplished in the manner herein provided.

SECTION 8.12       Waiver of Jury Trial.  EACH OF THE PARTIES HEREBY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY ACTION OR LIABILITY DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

SECTION 8.13       Conflict of Interest.  If any Seller so desires and without the need for any consent or waiver by the Purchaser or the Company, Shutts & Bowen LLP ("Shutts & Bowen") and/or Greenberg Traurig, P.A. ("GT") shall be permitted to represent any or all of the Sellers and the Company after the Closing in connection with any matter, including, without limitation, anything related to this Agreement, the transactions contemplated hereby or thereby, or any disagreement or dispute relating hereto or thereto.  Without limiting the generality of the foregoing, after the Closing, Shutts & Bowenand/or GT shall be permitted to represent the Sellers and the Company, and any of their respective agents and Affiliates, or any one or more of them, in connection with any negotiation, transaction or dispute (for purposes of this Section 8.13, "dispute" includes any litigation, arbitration or other adversary proceeding) with the Purchaseror any of its respective agents or Affiliates under or relating to this Agreement, any of the transactions contemplated hereby or thereby, and any related matter, such as claims or disputes arising under other agreements entered into in connection with this Agreement.

SECTION 8.14       Counterparts.  This Agreement may be executed and delivered (including by scanned or facsimile transmission) in one or more counterparts, and by the different Parties in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

SECTION 8.15       Currency.  Unless otherwise specified in this Agreement, all references to currency, monetary values and dollars set forth herein shall mean United States (U.S.) dollars, "$" refers to United States dollars and all payments hereunder shall be made in United States dollars by wire transfer in immediately available funds to such account as shall have been specified in writing by the recipient thereof to the Party making such payment.

*Signatures on next page*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**SELLERS:**

Enrique Larach

**COMPANY:**

IMPEX OF DORAL, INC.
a Florida corporation

By: _____

Name: LUIS TORREGO

Title: CHIEF EXECUTIVE OFFICER

JARDIM USA, LLC,
a Florida limited liability company

By: _____
    Luis Miguel Pando, Manager

**PURCHASER:**

COPHAZ INVESTMENT INC.,
a company formed under the laws
of Panama

By: _____

Name: GIOVANNI DiMELLA.

Title: PRESIDENT

*Signatures continued on next page*

**PANDO:**

_____
Luis Miguel Pando


IRELA LARACH, SOLELY FOR THE PURPOSE OF AGREEING TO THE PORTIONS OF SECTIONS 5.03 AND 2.05(b) THAT ARE EXPRESSLY APPLICABLE TO HER:

_____
Irela Larach

## ANNEX I

### Shares

| Name | # of Shares | % |
|------|-------------|---|
| Enrique Larach | 28 | 28% |
| JARDIM USA, LLC | 72 | 72% |

MIADOCS 8389889 8

## ANNEX II

## Calculation of Closing Date Payment

MIADOCS 8389889 8

**ACTIVE EXCLUSIVE DISTRIBUTION CONTRACTS**

| COMPANY NAME | COUNTRY | BRAND |
|---|---|---|
| Bryant Franklin | Nigeria | Mini Stars |
| Diversit | Kuwait | NOWETS |
| Dalian Olulai | China | Sea Dreams |
| Everyday Supermarkett | Nigeria | Nowets & Prospero |
| FYG | Saudi Arabia | Prospero |
| Feras | Jordan | Prospero |
| Qingdao | China | Nowets & Prospero |
| Susana | Dom Rep | Tiny Jeans  & Prospero |
| Admek International | Nigeria | Sea Dreams |
| AEF | China | Tiny Jeans |
| Briama | Ghana | Sea Dreams |
| Ruth the Angel | Ghana | Nowets |
| Comfort Zone | Nigeria | Tiny Jeans |



CLEANING SYSTEMS

March 13, 2013

Tessie Estevez
Impex of Doral
7850 Nw 80th St
Suite 3
Medley, FL 33166

Dear Tessie:

We are pleased to have you as a potential client at **Anago**, and are confident we can be an affordable service to you. The enclosed information was prepared to help guide you in your decision about a service procurement agreement with us. Should you desire to contact us, our local office is located in Pompano Beach, at 3350 NW 22nd Terrace, Suite 1200B.

Our quote is based on time values outlined by the Building Service Contractors Association International. These time values are standards within our industry utilized in estimating Housekeeping Tasks. In the summary that follows, a custom-tailored program has been compiled for your building. All **Supervision, Labor, Supplies and Equipment, Payroll Taxes, and Insurance** have been included in the pricing schedule.

Our Franchisees' services are covered under an insurance policy for Bodily Injury, Property Damage, Public Liability, and Workers' Compensation.

We look forward to working with you in the near future.

Best Regards,

Sergio Cesario
Sales Consultant
**Anago of South Florida**
SDC / eos



## Anago and the Franchise Owner Concept

Franchising of individually owned office cleaning businesses is a proven concept and it is widely used in the United States.

The concept works because of the simple principle that the owner of the business is the supervisor of, and major participant in, the actual cleaning and maintenance of the building. Therefore, since the person overseeing the actual work has a substantial investment in the business, he or she cannot afford to have an unhappy customer.

Your business benefits from unique features that set Anago Franchisees apart from other janitorial services including their use of our SmartClean™ program, communications log, solid client support, advanced recommended cleaning methods and equipment, and commitment to cleaning green. You can focus on your business, while our Franchise Owners keep your working environment safe and clean at a price you can afford.

People are simply more comfortable and productive in an environment that feels clean. With Anago's proven program, you receive a customized schedule of cleaning based on your priorities and budget. This rotational, systematic service ensures the highest level of cleanliness for the health of your employees and clients and also provides an unbeatable first impression!

## Anago Operations

### Insurance
Our Franchisees carry Workers' Compensation Insurance and Contractors' Comprehensive General Liability Insurance and pay all Social Security, State, and Federal Unemployment Taxes. Certificates are available upon request.

### Working Tools
Following is a list of the "Working Tools" provided and used by our Franchise Owners, depending on the type of service rendered: Wall Brushes, Waxes, Carpet Sweepers, Squeegees, Wax Cleaners, Disinfectants, Vacuum Cleaners, Wiping Cloths, Metal Polish, Chamois, Wet Mops, Rubber Gloves, Dust Cloths, Floor Machines, Scouring Powder, Buckets, Mop Presses, Floor Dressings, Dust Mops, Dust Pans, and Sponges.

### Hours of Service
Daily hours shall be Monday through Friday, after 5:00 p.m., unless otherwise specified.  Holidays excluded are New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, and Christmas Day.

### Supervision
Anago shall stay in close contact with both management and cleaning personnel concerning all work performed.  To this end, Anago Franchisees and their employees maintain the latest in communication technology, to ensure close communication as well as necessary follow-up procedures.

### Security
A Communications Follow-Up Log is maintained, describing the situation in question and the follow-up that transpired. Anago's nightly checklist ("The Third Pass") provides checks to ensure the building is properly secured upon completion of duties.

Initial:
PID: IMPEXOFDOR
SID: 33166



## Area Specifications

We are pleased to submit this Proposal to furnish Janitorial Service <u>3 days per week</u> herein specified at the following location:

**Impex of Doral**
**7850 Nw 80th St**
**Suite 3**
**Medley, FL 33166**

<u>Serviced Areas:</u>
A.   Offices
B.   Restrooms (1 in Warehouse)
C.   Common Areas
D.   Conference Room
E.   Break Rooms
F.   Kitchen
G. HR Room (when unlocked for Anago)
NOTE: Exclude IT Room, HR Room ( IF LOCKED..)

The specifications and the terms as set forth describe the services to be performed, frequency, and conditions of the agreement. The Client requests that products and materials used are those that are recommended by Anago.

## Cleaning Specifications

**Job Site: Impex of Doral, Medley**
**Time Window: Monday, Wednesday & Friday after 5:00 pm**

<u>Nightly Cleaning</u>

**Serviced Areas**

1.   All receptacles will be emptied and trash removed to dumpster area.  All liners furnished by client.
2.   Dust telephones.
3.   Dust all surfaces of desks, (including behind computers, monitors and their bases, and beneath any movable objects on desks), tables, counters, filing cabinets, and other office equipment.
4.   Dust all vertical surfaces of desks, file cabinets, and other office furniture.
5.   Wipe clean Conference Room tables and properly arrange chairs.
6.   Wipe clean tables, chairs, sink, counters and exterior of cabinets in Kitchen.
7.   Wipe clean interior and exterior of microwave and exterior of other appliances.
8.   Vacuum all traffic areas of carpeting.
9.   Dust and mop all hard surface floors.
10.   Spot mop all hard surface floors.
11.   Clean entrance area door glass.
12.   Spot clean partition glass, as needed.
13.   Spot clean glass between offices and production/warehouse.
14.   Clean interior and exterior of elevator cabs.

Initial: TE
PID: IMPEXOFDOR
SID: 33166



## Restrooms

1. Fill dispensers with towels, tissue, and hand soap. (Supplied by client). Wipe dispenser fronts.
2. Empty trash receptacles and wipe, if needed.
3. Dust sink traps, counters, ledges, mirrors, and air grills.
4. Sweep tile floor.
5. Disinfect interior and exterior of toilets and toilet seats. Polish chrome.
6. Disinfect interior and exterior of urinals. Polish chrome.
7. Spot clean toilet partitions and dust tops.
8. Clean sinks and polish chrome fittings.
9. Remove splash marks from walls around sinks.
10. Clean and polish mirrors.
11. Wet mop restroom floors with disinfectant, pouring water down drains to eliminate odors.

## Weekly Cleaning

1. Detail vacuum all carpet edges, corners and beneath furniture.
2. Dust baseboards.
3. Mop hard surface floors, including corners, edges, and under office furniture.
4. Wipe down couch in waiting area
5. Dust windowsills.
6. Dust picture frames.
7. Dust all office equipment, including behind computers, monitors and their bases, and any movable objects on desks.
8. Dust ceiling corners and remove cobwebs.

## Monthly Cleaning

1. Clean corners and edges of restroom floors.
2. Dust and clean interior of window glass.
3. Spot clean light switches.
4. Wipe down edges of door frames.
5. Disinfect telephones.
6. Dust vertical and venetian blinds.
7. Dust bi-fold doors in hallway
8. High dust HVAC vents and louvers.



## Service Procurement Agreement

**WHEREAS:** **Impex of Doral** hereinafter referred to as "Client", is desirous of the services of **Anago** for the purpose of keeping the building properly cleaned as outlined, and

**WHEREAS:** **Anago** is in the business of procuring for its clients, maintenance and janitorial services, under the trade name and operating style unique to **Anago,** and desires to contract with Client for the performance of said janitorial services to be further set out in this agreement.

**THEREFORE:** In consideration of the faithful performance of the services hereinafter specified, the compensation to be paid therefore and the mutual covenants and agreements of the parties hereinafter set forth to be kept and performed and the mutual benefits to each of the parties therefore, it is hereby contracted and agreed to as follows:

I. **Anago** agrees to have the SERVICED AREAS serviced <u>3 days per week</u> as outlined in the Area Specifications attached hereto and by specific reference made a part hereof.

II. **Anago** agrees to have its representatives furnish all equipment, tools, and other paraphernalia necessary to the performance of the duties, said duties being to maintain the SERVICED AREAS in a neat, clean, and orderly condition as outlined in the Cleaning Specifications attached hereto and by specific reference made a part hereof.

III. In consideration of the performance by **Anago's** representatives of the janitorial services to be rendered as described herein, Client agrees to pay the sum of: <u>**Four Hundred Fifty Dollars ($450.00) – Per Month**</u> **Plus Applicable Sales Tax.** Payment shall be due on or before the TENTH day of each month for said month's services. A late charge of 1.5% per month will be assessed on all invoices thirty days past due. Adjustment to reflect additions or deletions of space cleaned or for change in frequency of service will be made as requested. The new price and condition will be in writing and signed by both parties.

IV. It is expressly agreed that **Anago** and its representatives are not, and shall not be, during the term hereof, employees of Client, but are independent contractors, and in this regard **Anago** and its representatives will not be within the protection or coverage of Client's Workers' Compensation Insurance and no withholding of Social Security, Federal, or State Income Tax or other deductions shall be made from the sums agreed to be paid **Anago** herein, the same being contract payments and not wages.

V. It is agreed that **Anago** will select all representatives to perform the agreed upon obligations. Client warrants, covenants, and agrees that during the term of this agreement and within one hundred eighty (180) days after termination, that they will not employ any employee, agents, associates, or Franchisees of **Anago**. **Anago** warrants, covenants, and agrees that during the term of this agreement and within one hundred eighty (180) days after termination, it will not employ any employees, agents, associates, or Franchisees of Client

VI. The term of this agreement shall be for one (1) year from the date hereof, and thereafter shall automatically be extended on the same terms and conditions unless terminated by one of the parties in accordance with the terms of this paragraph. This agreement may be terminated for non-performance only.  Before any such termination is effective, Client agrees to notify **Anago** in writing of the non-performance items and to give **Anago** fifteen (15) days to cure said items. If satisfaction is not achieved after the fifteenth day, the terminating party must give the non-terminating party a thirty (30) day written notice via certified mail with return receipt requested, stating the non-performance items.

VII. The parties agree and understand that it is impossible to determine the actual damages caused by a breach of this agreement by Client. Therefore, any amount due and owed under this contract for any remaining part of the term of this contract shall be accelerated as due and owed in the event of a breach of the obligations to make payments hereunder. Such acceleration will be liquidated damages due and owed to **Anago.**

VIII. Client agrees not to withhold any portion of the monthly contract amount for any reason, unless prior written permission is obtained from **Anago,** as the obligation to make payments hereunder is an independent obligation. In the event that enforcement of any obligation, owed to **Anago,** is placed in the hands of an attorney for collection, compromise or any other action, Client agrees to pay the reasonable attorney's fees, cost and necessary disbursements, in addition to any other relief that may be granted.

IX. This contract will be governed by the laws of the state of Florida. The parties hereto submit to jurisdiction in Broward County, Florida. All actions brought pursuant to this contract shall be brought in Broward County, Florida. The parties further agree to service of any action filed in Broward County, Florida, via certified mail.

Impex of Doral
7850 Nw 80th St
Suite 3
Medley, FL 33166

Initial: _____
PID: IMPEXOFDOR
SID: 33166



## Contract Authorization

X.

Anago of South Florida
3350 NW 22nd Terrace, Suite 1200B
Pompano Beach, FL 33069

Sales Consultant
Title

Sergio Cesario
Print Name

Estrellita, Inc., d/b/a
**Anago of South Florida**

Impex of Doral
7850 Nw 80th St
Suite 3
Medley, FL 33166

Title

Tessie Estevez
Print Name

Authorized Client Signature

Emergency Contact Information:

Name: _Tessy Estevez_

Phone number: 305.393.1480

This Agreement, entered into on this ___9___ day of __April__, 2013
Shall be effective as of the ___9___ day of __April__, 2013.

PID: IMPEXOFDOR
SID: 33166



# Impex of Doral

**\*Please initial ONLY those services which you are requesting.**

## Initial/Comprehensive Clean

(Initial)

Comprehensive detail cleaning, as per the attached specifications.          No Charge          *TE*

## Additional Services

(Initial)

Emergency (Floods, etc.)          $45.00 p/h          *TE*


Tessy Estevez.
_____
Print Name

_____
Authorized Client Signature

Date: 04 / 09 / 13

Impex of Doral
7850 Nw 80th St
Suite 3
Medley, FL 33166

PID: IMPEXOFDOR
SID: 33166



## Accounts Receivable Information                                   PREPRIMEDOC AGO

**PID: IMPEXOFDOR**                                                  **Control #: 23736**

**SID: 33166**

**Sales Consultant:** Sergio Cesario

**Job Site Information**

Location:       Impex of Doral
Address:        7850 Nw 80th St, Suite 3
City/State/Zip:  Medley, FL 33166
Contact Name:   Tessie Estevez
Phone:          305.470.0041

**Client's Accounts Payable Information (if different from above)**

Address: _Same as above._   City/State/Zip: _Miami, FL, 33166._

Contact Name: _Nidia Areas-or-_   Phone Number: _305.470.0041_
_Rod Vazquez_

> Credit card payment options are available. A surcharge will be added to the monthly billing amount for processing. Please contact your Anago office for applicable rates and forms.

Contract Amount: $450.00 **plus applicable Sales Tax**

Contract's Signing Date: _04 / 09 / 13_          Starting Date: _04 / 09 / 13_

Contract's Time Window:  Monday, Wednesday & Friday after 5:00 pm

Initial if an "Initial Cleaning" has been accepted _TO_      I/C Date: _04 / 11 / 13_

(Initial Cleans must be scheduled for completion within the first 30 days of the contract.)

Client received a copy of the Insurance Certificate: YES _____   NO _____

If Client is Tax-Exempt, their Certificate has been provided to Anago:    YES _____   NO _____

*All items above must be filled in.*

Initial: _TO_

 

**ⓔCYLOGIX**
**CONSULTING & DESIGN GROUP**

**_Microsoft·_**
**C E R T I F I E D**
_Systems Engineer_

**Specialists in Information Technologies and Communication Solutions**

**Service Agreement Contract**
Prepared for: **Impex of Doral**

October 30, 2012

**Explanation of terms:**

This IT Service Plan Agreement is between **Impex of Doral, Inc.** (the "Customer") **Cylogix Information Technologies, Inc.** (the "Service Provider")

**The customer** is of the opinion that the Service Provider has the necessary qualifications, experience and abilities to provide services to the Customer.

**The service provider** is agreeable to providing such services to the Customer, on the terms and conditions as set out in this Agreement.

This Agreement is valid for a period of <u>12</u> months. The "Customer" has the right to renew or cancel the Agreement after the designated period has expired provided that all due amounts have been paid in full.

**Explanation of services:**

**Service plan <u>includes</u> the following IT services:**

- General support for Windows Server 2008 & 2003 platforms.
- Specialized support for Microsoft Exchange Server technologies.
- Purchase Quotation and Procurement of New Hardware and Software.
- 3rd party vendor management for current and future providers.
- Hardware Repair and Maintenance on Computers and Communications Equipment
- Coordination with SAGE Programmer as needed.
- Phone software programming as needed.
- Company Domains – registration and renewals.
- Support for SEO technologies (no marketing activities) and CMS for main and sisters websites.
- Management of data backup systems both local and offsite.
- Printing issues from any printing device in the office.
- Internet & internal network issues.
- Software Licensing Management.
- Any e-mail related issues.
- Business applications issues including L.O.B. (Line of business Software).
- Windows 7 Pro, Vista Business and XP Pro updates and security patch updates.
- Outlook 2007/2010 User profiles setup.
- Minor Ethernet Cat5 cabling work as needed.

**Special provisions and considerations:**

**Telecommunications:** The "Customer" agrees to keep active and current the Cisco Technical Support agreement at least for the length of this service agreement.

**Servers** (Hyper-V, Application and Microsoft Exchange Servers): In the event the "Customer" decides to purchase and setup a new server an extra **$2500** will be added to the monthly flat fee for that month.  This charge will include all labor required to have the new system up and running regardless of time invested.

**Infrastructure: (Ethernet and low voltage cabling)** In the event of physical relocation or major overhaul of the existing infrastructure. The "Customer" will be required to subcontract a specialized company. The Service Provider doesn't have the required insurance, man power or equipment to effectively execute this type of work.

**Terms and conditions:**

**The customer** agree that the service provider has the qualification to render **IT SERVICES** and **IN CONSIDERATION OF** the matters described above and of the mutual benefits and obligations set forth in this Agreement, the receipt and sufficiency of which consideration is hereby acknowledged, the parties to this Agreement agree as follows:

**The service provider** will try to provide the best service technically and humanly possible to resolve any issue related to the service provided.

**Software Licenses:** The customer retains ownership of all licenses by direct or indirect purchase. The service provider will not be responsible for keeping, storing or maintaining such licenses.

**Computers, network equipment, and general hardware warranty:** No expressed or implied warranty will be assumed by the service provider unless stayed by the service provider in writing on any equipment even if it was purchased by the service provider beyond the manufacture's limited or extended warranty.

**Liabilities:** The service provider will not be responsible for any incidental or consequential damages including but not limited to data lost, hardware malfunction, down time, lost of profit or revenue, lost of equipment and related claims. In the event of such incidents might occurred, the service provider will work to repair or amend any damage in a timely fashion way and will mediate to determine if compensation should be applied or not based on the items include in this agreement section – Explanation of services.

**Rates and Compensation:**

A flat fee of **$3000** will be billed each month that will include all services explained above. Additional fees are explained on the **"special provisions and considerations"** section.

**IN WITNESS WHEREOF** the parties have duly executed this Service Agreement this _____

day of _____, 2012.

_____,
Service Provider/ Authorized Signature

_____,
Customer /Authorized Signature

## Enrique Larach

| | |
|---|---|
| **From:** | Steve Light |
| **Sent:** | Thursday, November 01, 2012 10:16 AM |
| **To:** | Enrique Larach |
| **Subject:** | FW: SERVICE AGREEMENT - Impex |
| **Attachments:** | SERVICE AGREEMENT - Impex.pdf |

I meet with Aliet and reviewed the service agreement with him. He is keeping the monthly rate the same at $3000. The agreement is for 12 months but we can terminate at any time with no obligation to pay the balance of the agreement. The list of services are comprehensive and take care of our needs. The only new item is the additional cost of $2500 should we have to replace a server because of the amount of work involved.

After you review and if you agree please sign the agreement.


**Steven Light**
**Vice President**
slight@impexofdoral.com
7850 NW 80th St.
Miami, FL. 33166
Phone: 305.470.0041 Ext. 230
Fax: 305.470.0109
www.impexofdoral.com

---

**From:** Aliet Casas [mailto:aliet@cylogix.net]
**Sent:** Tuesday, October 30, 2012 1:51 PM
**To:** Steve Light
**Subject:** SERVICE AGREEMENT - Impex

Steve,

Attached is the final Service Agreement.

I will meet with you on a few minutes to discuss it.

Thanks,


Aliet Casas
System Network Engineer | Web Developer
**CYLOGIX Information Technologies, Inc.**
P: 305.221.4762
C: 786.586.9494
**On the web:** www.cylogix.net



# FLORIDA EXPORT FINANCE CORPORATION

### A NOT FOR PROFIT CORPORATION
### CREATED AND FUNDED BY THE STATE OF FLORIDA



April 26, 2013


Mr. Enrique Larach

President

Impex of Doral, Inc.

7850 NW 80 Street Suite No. 3

Miami, FL 33166


Dear Mr. Larach;


The Florida Export Finance Corporation (FEFC), Board of Directors has approved the renewal of the

Guarantee to your suppliers.

This Guarantee is conditioned upon the attached Agreement being signed by all the parties.

It will become effective upon receipt by the FEFC of the signed document with all terms and conditions
fulfilled.


Sincerely,

Miguel A. Nieves, Jr.,

Credit Manager



# FLORIDA EXPORT FINANCE CORPORATION

**A NOT FOR PROFIT CORPORATION
CREATED AND FUNDED BY THE STATE OF FLORIDA**

### AGREEMENT



This agreement ("Agreement") entered into by Impex of Doral, Inc. (Impex), Enrique Larach, Luis M. Pando, and Impex of Doral Logistics, Inc. (individually and collectively referred to herein as Guarantor(s) and Florida Export Finance Corporation (FEFC) whereas Impex has requested FEFC, and FEFC has agreed, to issue payment guarantees to selected and mutually agreed suppliers of Impex and Impex agrees to immediately repay FEFC should any supplier(s) claim on such guarantee(s) be paid by FEFC; and Guarantor(s), jointly and severally, agree to immediately repay FEFC upon notification that Impex has not repaid FEFC within ten days of notification to Impex that FEFC has paid a claim to a supplier.

Impex shall pay FEFC a Guarantee Fee of 3% of the maximum total dollar amount FEFC agrees to guarantee to suppliers on behalf of Impex and such fee shall be paid in full prior to issuance of any guarantee. The maximum total dollar amount of such guarantees is $1,000,000. Any and all guarantees issued by FEFC under this agreement shall automatically expire April 30, 2014 except that any non-payment to FEFC in accordance with this agreement shall result in immediately cancellation of all issued guarantees.

All payments shall be made in lawful money of the United States of America and shall be made by Impex and/or Guarantor(s) by check, wire transfer or ACH payment to FEFC at the address designated by FEFC in this Agreement or at such address as FEFC may from time to time designated to Impex by notice in accordance with the provisions of this Agreement.

Impex and Guarantor(s) agree to provide to FEFC and/or allow FEFC to examine, in a reasonable time period, any and all financial information requested by FEFC, both business and personal, as it may relate to this Agreement.

Any notice or other communication required or permitted under this Agreement as defined herein shall be given in writing and delivered by hand, first class mail, overnight delivery services or email, as follows:

If to Impex:          Impex of Doral, Inc.
                      7850 NW 80 Street
                      Suite No. 3
                      Miami, Florida 33166
                      Attn: Enrique Larach
                      Email: elarach@impexofdoral.com

If to Guarantor(s): Same as Impex

If to FEFC:           Florida Export Finance Corporation
                      10400 N.W. 33rd Street, Suite 200
                      Miami, FL  33173
                      Attn: J. Stephen Fancher, President & CEO
                      Email: fefc@gate.net

10400 NorthWest 33rd Street, Suite 200, Miami, FL 33172-5902
Telephone: (786) 845-0400 / Facsimile: (786) 845-0404
www.fefc.biz

This Agreement shall be governed by and construed in accordance with the laws of the State of Florida.

In the event that any provision of this Agreement is deemed unenforceable, all other provisions shall remain in full force and effect. This Agreement shall not be amended or modified, and no provision of this Agreement may be waived, unless by written agreement signed by Impex, Guarantor(s), and FEFC. No waiver of any breach or default hereunder shall be deemed a waiver of any subsequent breach or default of the same or similar nature.

In witness thereof, the undersigned(s) has executed this Agreement on_____, 2013

Impex of Doral, Inc.

_____

GUARANTOR: Enrique Larach

_____

GUARANTOR: Luis M. Rando

_____

GUARANTOR: Impex of Doral Logistics, Inc.

_____

FLORIDA EXPORT FINANCE CORPORATION

_____
J. Stephen Fancher, President and CEO

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Account Type | Officer |
|---|---|---|---|---|---|
| $750,000.00 | 2/01/2013 | 2/01/2014 | 2012-SB01 | Small Business | C. Mier |
| References in the shaded area are for Lender's use only and do not limit the application of this document to any particular loan item. Any item above containing "***" has been omitted due to text length limitations. | | | | | |

Borrower: **IMPEX OF DORAL, INC.**
**(TIN: 65-0481375)**
**7850 N.W. 80th Street, Suite #3**
**Medley, Florida 33166**

Lender: **New Continent Finance, Inc.**
**255 Alhambra Circle, Suite 370**
**Coral Gables, FL 33134**

---

**THIS BUSINESS LOAN AGREEMENT dated February 1, 2013, is made and executed between Impex of Doral, Inc. ("Borrower") and New Continent Finance, Inc. ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement ("Loan"). Borrower understands and agrees that: (A) in granting, renewing, or extending any loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.**

**TERM**. This Agreement shall be effective as of February 1, 2013, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY**. The following persons currently are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of his or her authority: Mr. Luis Miguel Pando, Chairman and Authorized Signer of Impex of Doral, Inc.; Mr. Enrique E. Larach, President of Impex of Doral, Inc. and Authorized Signer.

**CONDITIONS PRECEDENT TO EACH ADVANCE.** Lender's obligation to make the initial Advance under this Agreement shall be subject to the fulfilling to Lender's satisfaction of all of the conditions set forth in this Agreement and in the Related Documents.

**Loan Documents**. Borrower shall provide to Lender the following documents for the Loan: (1) the Note; (2) Security Agreements granting to Lender security interests in the Collateral; (3) financing statements and all other documents perfecting Lender's Security Interests; (4) evidence of insurance as required below; (5) guaranties; (6) together with all such Related Documents as Lender may require for the Loan; all in form and substance to Lender and Lender's counsel.

**Borrower's Authorization**. Borrower shall have provided in form and substance satisfactory to Lender properly certified resolutions, duly authorizing the execution and delivery of this Agreement, the Note and Related Documents. In addition, Borrower shall have provided such other resolutions, authorizations, documents and instruments as Lender or its counsel, may require.

**Payment of Fees and Expenses**. Borrower shall have paid to Lender all fees, charges, and other expenses which are then due and payable as specified in this Agreement or any Related Document.

**Representations and Warranties**. The representations and warranties set forth in this Agreement, in the Related Documents, and in any document or certificate delivered to Lender under this Agreement are true and correct.

**No Event of Default**. There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement or under any Related Document.

**REPRESENTATIONS AND WARRANTIES**. Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exits:

**Organization**. Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Florida. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains its principal office at 7850 N.W. 80th Street, Suite #3, Medley Florida 33166. Unless Borrower has designated otherwise in writing, this is the principal office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the

Initials

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Account Type | Officer |
|---|---|---|---|---|---|
| $750,000.00 | 2/01/2013 | 2/01/2014 | 2012-SB01 | Small Business | C. Mier |

References in the shaded area are for Lender's use only and do not limit the application of this document to any particular loan item. Any item above containing "***" has been omitted due to text length limitations.

location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names**. Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does Business: None.

**Authorization**. Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, order applicable to Borrower or to Borrower's properties.

**Financial Information**. Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statements supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effects**. This Agreement constitutes, and any instrument or agreement Borrower is required to give under this agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties**. Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances**. Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters, (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against and all claims, losses, liability, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims**. No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledges by Lender in writing.

**Taxes**. To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other government charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority**. Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interest on or affecting any

Initials

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Account Type | Officer |
|---|---|---|---|---|---|
| $750,000.00 | 2/01/2013 | 2/01/2014 | 2012-SB01 | Small Business | C. Mier |
| References in the shaded area are for Lender's use only and do not limit the application of this document to any particular loan item. Any item above containing "***" has been omitted due to text length limitations. | | | | | |

of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect**. This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notice of Claims and Litigation**. Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records**. Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements**. Furnish Lender with such financial statements and other related information at such frequencies and in such detail as Lender may reasonably request.

**Additional Information**. Furnish such additional information and statements, as Lender may request from time to time.

**Financial Covenants and Ratios**. Comply with the following covenants and ratios:

**Other Requirements**. 1) Copy of Policy ENB-467236. 2) Assignment of Ex-Im Bank policy No. ENB-467236; Policy Payment Limit: $1,500,000 3) Policy endorsed to New Continent Finance, Inc. must include "Standard" assignment at all times. 4) Original Standard assignment of Ex-Im Bank Policy No. ENB-467236 i/a/o $1,500,000. 5) Confirmation from Ex-Im Bank that a valid assignment form has been filed reflecting New Continent Finance, Inc. as loss payee for the appropriate policy period. 6) Evidence of payment of premium no later than 30 days following the end of month a shipment is made. 7) ***Documentation to evidence export transaction: (a) Buyer's purchase order, pro forma invoice issued by the Insured or manually signed contract of sale for the goods shipped. A pro forma invoice or purchase order must be <u>manually signed</u> and include the printed name and tile of the person signing on behalf of the Buyer. All contracts of sales, pro forma invoices and purchase orders must, at a minimum, set forth a specific description (e.g. name and model number) , quantity and price of products; (b) Insured's commercial invoice to the Buyer for the products shipped. Each invoice must, at a minimum, set forth a specific description (e.g. name and model number), quantity and price of the products; (c) A clean, onboard ocean, airway, railway or truck bill of lading signed by an unaffiliated third party carrier evidencing the export of the products shipped and (a) setting out the name, address, phone number and email address of the transport company and (b) identifying the Insured and the Buyer; (d) Insured's irrevocable instructions to the Buyer in writing to make payments directly to Assignee or Insured's account with Assignee; (e) Provide evidence for which premium has been reported and paid by the Insured and accepted by Ex-Im Bank on receivables to be financed; (f) Certificate of US content (at least 51% where applicable).*** 8) Facility maturity to coincide with policy period. 9) Establish and/or maintain a checking account with a major U.S.Bank. 10) Semi-annually company prepared financial statements to be submitted 45 days after each semester end accompanied with an A/R aging as of the same date and annual compiled financial statements to be submitted within 120 days of each fiscal year. 11) Borrower to provide a copy of corporate tax return on an annual basis upon filing (or copy of extension within 30 days of deadline). 12) Guarantor(s) to provide personal financial statement annually (within 30 days of the anniversary of their latest one on file), and copy of their personal tax returns within thirty days of filing (or copy of extension within 30 days of deadline). 13) No material change in ownership or control. 14) All other existing terms and conditions.

Except as provided above, all computations made to determine compliance with the requirements contained in this paragraph shall be made in accordance with generally accepted accounting principles, applied on a consistent basis, and certified by Borrower as being true and correct.

**Insurance**. Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender. Borrower, upon request of Lender, will deliver to Lender from time to time the polices or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports**. Furnished to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following: (1) the

Initials

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Account Type | Officer |
|-----------|-----------|----------|---------|--------------|---------|
| $750,000.00 | 2/01/2013 | 2/01/2014 | 2012-SB01 | Small Business | C. Mier |

References in the shaded area are for Lender's use only and do not limit the application of this document to any particular loan item.
Any item above containing "***" has been omitted due to text length limitations.

name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Guaranties.** Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantor(s) named below, on Lender's forms, and in the amount and under the conditions set forth in those guaranties.

| Name of Guarantors | Amounts |
|--------------------|---------|
| Mr. Enrique Elias Larach | Unlimited |
| Mr. Luis Miguel Pando | Unlimited |
| Mr. Francisco Javier Alvarez Lopez | Unlimited |

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.** Unless waived in writing by Lender, provide Lender at least annually, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or mission on Borrower's part or on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on

Initials

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Account Type | Officer |
|-----------|-----------|----------|---------|--------------|---------|
| $750,000.00 | 2/01/2013 | 2/01/2014 | 2012-SB01 | Small Business | C. Mier |

References in the shaded area are for Lender's use only and do not limit the application of this document to any particular loan item.
Any item above containing "****" has been omitted due to text length limitations.

Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resource.

**Additional assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation, or guideline, or interpretation or application of any thereof by any court or administrative or governmental authority (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state, or local income or franchise taxes imposed on Lender), reserves requirements, capital adequacy requirements or other obligations which would (A) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (B) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligation with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender thereof, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to ) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of Business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) pay any dividends on Borrower's stock (other than dividends payable in its stock), provided, however that notwithstanding the foregoing, but only so long as no Event of Default has occurred and is continuing or would result from the payment of dividends, if Borrower is a "Subchapter S Corporation" (as defined in the Internal Revenue Code of 1986, as amended), Borrower may pay cash dividends on its stock to its shareholders from time to time in amounts necessary to enable the shareholders to pay income taxes and make estimated income tax payments to satisfy their liabilities under federal and state law which arise solely from their status as Shareholders of a Subchapter S Corporation because of their ownership of shares of Borrower's stock, or purchase or retire any of Borrower's outstanding shares or alter or amend Borrower's capital structure.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.** Borrower will not enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceeding, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

Initials

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Account Type | Officer |
|---|---|---|---|---|---|
| $750,000.00 | 2/01/2013 | 2/01/2014 | 2012-SB01 | Small Business | C. Mier |
| References in the shaded area are for Lender's use only and do not limit the application of this document to any particular loan item. Any item above containing "***" has been omitted due to text length limitations. | | | | | |

**RIGHTS OF SETOFF**. To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT**. Each of the fallowing shall constitute an Event of Default under this Agreement:

**Payment Default**. Borrower fails to make any payment when due under the loan.

**Other Defaults**. Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties**. Borrower or any grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements**. Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**EFFECT OF AN EVENT OF DEFAULT**. If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type describe in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singular or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**ADDITIONAL EVENTS OF DEFAULT**. In addition to the Events of Default set forth in the paragraph entitled "Events of Default," it shall be an Event of Default under this Agreement if the Enhanced Assignment and/or Export Credit Insurance Policy No. ENB-467236 shall be terminated or ineffective for any reason with respect to the loan.

Initials

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Account Type | Officer |
|-----------|-----------|----------|---------|--------------|---------|
| $750,000.00 | 2/01/2013 | 2/01/2014 | 2012-SB01 | Small Business | C. Mier |

References in the shaded area are for Lender's use only and do not limit the application of this document to any particular loan item.
Any item above containing "***" has been omitted due to text length limitations.

**MISCELLANEOUS PROVISIONS**. The following miscellaneous provisions are a part of this Agreement:

**Amendments**. This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorney's Fees; Expenses.** Borrower agrees to pay upon demand all of lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings**. Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests.  Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser or such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan.  Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law**. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Florida without regards to its conflicts of law provisions.  This Agreement has been accepted by lender in the State of Florida.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement.  Any party may change its address for notices under this Agreement by giving written notice to the other parties, specifying that the purpose of the notice is to change the party's address.  For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more then one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable.  If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower**. To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing

Initials

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Account Type | Officer |
|---|---|---|---|---|---|
| $750,000.00 | 2/01/2013 | 2/01/2014 | 2012-SB01 | Small Business | C. Mier |

References in the shaded area are for Lender's use only and do not limit the application of this document to any particular loan item. Any item above containing "***" has been omitted due to text length limitations.

however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury. All parties to this agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.**

**DEFINITIONS**. The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Advance**. The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf on a line of credit or multiple advance basis under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement, as this Business Loan Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement from time to time.

**Borrower.** The word "Borrower" means "Impex of Doral, Inc." and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C.Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default**. The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

Initials

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Account Type | Officer |
|---|---|---|---|---|---|
| $750,000.00 | 2/01/2013 | 2/01/2014 | 2012-SB01 | Small Business | C. Mier |
| References in the shaded area are for Lender's use only and do not limit the application of this document to any particular loan item. Any item above containing "***" has been omitted due to text length limitations. | | | | | |

**Hazardous Substances**. The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means New Continent Finance Inc., its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note executed by Impex of Doral, Inc. in the principal amount of $750,000.00 dated February 1, 2013, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens**. The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT AND BORRWER AGREES TO ITS TERMS. THIS BUSINES LOAN AGREEMENT IS DATED FEBRUARY 1, 2013.**

BORROWER:
IMPEX OF DORAL, INC.

By: ______________________
Enrique E. Larach, President
of Impex of Doral, Inc.

By: ______________________
Luis Miguel Pando, Chairman
of Impex of Doral, Inc.

Initials

# BUSINESS LOAN AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Account Type | Officer |
|---|---|---|---|---|---|
| $750,000.00 | 2/01/2013 | 2/01/2014 | 2012-SB01 | Small Business | C. Mier |

References in the shaded area are for Lender's use only and do not limit the application of this document to any particular loan item. Any item above containing "***" has been omitted due to text length limitations.

LENDER:
NEW CONTINENT FINANCE, INC.

By: [signature]
Carlos A. Mier,
Director

Initials

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Account Type | Officer |
|---|---|---|---|---|---|
| $750,000.00 | 2/01/2013 | 2/01/2014 | 2012-SB01 | Small Business | C. Mier |
| References in the shaded area are for Lender's use only and do not limit the application of this document to any particular loan item. Any item above containing "***" has been omitted due to text length limitations. | | | | | |

Grantor: **IMPEX OF DORAL, INC.**
**(TIN: 65-0481375)**
**7850 N.W. 80th Street, Suite #3**
**Medley, Florida 33166**

Lender: **New Continent Finance, Inc.**
**255 Alhambra Circle, Suite 370**
**Coral Gables, FL 33134**

---

**THIS COMMERCIAL SECURITY AGREEMENT dated February 1, 2013, is made and executed between Impex of Doral, Inc. ("Grantor") and New Continent Finance, Inc. ("Lender").**

**GRANT OF SECURITY INTEREST. For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.**

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement.

> **All Inventory, Chattel Paper, Accounts, Equipment and General Intangibles and All rights under Export Credit Insurance policy No. ENB-467236 issued by Export-Import Bank of the United States, together with all endorsements, replacements and substitutions; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles and other accounts proceeds).**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lenders (whether checking, savings, or some other accounts). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other address as Lender may designate from time to time ) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in the Grantor's state of

Initials

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Account Type | Officer |
|---|---|---|---|---|---|
| $750,000.00 | 2/01/2013 | 2/01/2014 | 2012-SB01 | Small Business | C. Mier |
| References in the shaded area are for Lender's use only and do not limit the application of this document to any particular loan item. Any item above containing "***" has been omitted due to text length limitations. | | | | | |

organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regards to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles; the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or Leasing; (3) all storage facilities Grantor owns, rents, leases, or uses, and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sale of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consist of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Florida, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transaction Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interest granted for in this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall no be commingled with any other funds; provided however; this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this     Agreement.  No  financing  statement covering any of the Collateral in on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subject to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender

Initials